UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


MALIBU MEDIA, LLC,                    )
                                      ) Cause No.
        Plaintiff,                    ) 1:12-CV-01117-WTL-MJD
                                      ) Indianapolis, Indiana
   vs.                                ) **December 18, 2014**
                                      ) 8:38 a.m.
MICHAEL HARRISON,                     )
                                      )
        Defendant.                    )




**Before the Honorable**
**MARK J. DINSMORE**

OFFICIAL REPORTER'S TRANSCRIPT OF
EVIDENTIARY HEARING




Court Reporter:              David W. Moxley, RMR, CRR, CMRS
                             United States District Court
                             46 East Ohio Street, Room 340
                             Indianapolis, Indiana  46204


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

**APPEARANCES:**

**For Plaintiff:**              Michael K. Lipscomb, Esq.
                               Jason H. Cooper, Esq.
                               Lipscomb, Eisenberg &
                                Baker, PL
                               Penthouse 3800
                               2 South Biscayne Boulevard
                               Miami, FL  33131

                               Paul J. Nicoletti, Esq.
                               Nicoletti Law, PLC
                               Suite 433
                               33717 Woodward Avenue
                               Birmingham, MI  48009

**For Defendant:**             Gabriel J. Quearry, Esq.
                               Quearry Law, LLC
                               Suite A
                               386 Meridian Parke Lane
                               Greenwood, IN  46142

# I N D E X

**PLAINTIFF'S WITNESSES:**

MICHAEL PAUL HARRISON

Direct Examination by Mr. Cooper ................8
Cross-examination by Mr. Quearry ...............29
Redirect examination by Mr. Cooper ............70

PATRICK PAIGE

Direct Examination by Mr. Cooper ..............71
Cross-examination by Mr. Quearry ..............85

JASON EDWIN BOSAW

Direct Examination by Mr. Cooper ..............93

RHONDA ARNOLD

Direct Examination by Mr. Cooper ..............94

JOHN DAMON HARLAN

Direct Examination by Mr. Cooper ..............97
Cross-examination by Mr. Quearry ..............98

# I N D E X   O F   E X H I B I T S

**PLAINTIFF'S EXHIBITS:**                    **ADMITTED**

P1 ........................................11
P3 ........................................22

**DEFENDANT'S EXHIBITS:**                    **ADMITTED**

A .........................................55

4

```
1                    (In open court.)
2          THE COURT:  Good morning.  All right, it's
3  8:38 a.m., Thursday, December 18, 2014.  We're here on the
4  matter of Malibu Media, LLC, versus Michael Harrison,
5  1:12-cv-1117.  For the plaintiff, Malibu Media, LLC, we have
6  Jason Cooper.
7          MR. COOPER:  Good morning, Your Honor.
8          THE COURT:  Good morning.  Keith Lipscomb.
9          MR. LIPSCOMB:  Good morning, Your Honor.
10         THE COURT:  And Paul Nicoletti.
11         MR. NICOLETTI:  Good morning, Your Honor.
12         THE COURT:  And for the defendant, Mr. Harrison is
13 present with his counsel, Gabriel Quearry.
14         MR. QUEARRY:  Good morning, Your Honor.
15         THE COURT:  Good morning.  We are here for a hearing
16 on Plaintiff's motion for sanctions against Defendant for the
17 intentional destruction of material evidence, docket 237.
18 Your response was filed at docket 247, and a reply at docket
19 254.
20         Also before the Court is Plaintiff's motion in
21 limine to preclude Defendant's witnesses from testifying at
22 the evidentiary hearing, docket 288.  The response thereto is
23 docket 289; and the reply, docket 290.  My intention is to
24 take that motion under advisement.  I'm not going to rule on
25 it in advance of the hearing.  I'll make a determination
```

1  subsequent to the hearing.

2          So, I'm not going to preclude any of Defendant's

3  witnesses from testifying at the hearing.  If I subsequently

4  exclude them based on that motion, I will disregard their

5  testimony as the witnesses are presented.  Though, if there

6  are any specific evidentiary objections to specific questions

7  and answers, they should be made to be preserved in the event

8  that I do not exclude the witnesses' testimony; all right?

9          Also, as we proceed, for expediency's sake, I think

10 we should -- I don't intend to limit cross-examination to

11 direct.  And so when a witness is on the stand, Mr. Quearry,

12 you should fully examine them, and then that will preclude the

13 need to call them back later in the case.  So I would expect,

14 as a witness completes their testimony, that their testimony

15 will be complete and they may be excused unless counsel tells

16 me they need to remain to be called later.  Does that make

17 sense to everybody?

18          MR. LIPSCOMB:  Yes, Your Honor.

19          MR. NICOLETTI:  Yes, sir.

20          THE COURT:  All right.  We have about four hours.

21 So, Plaintiff, call your first witness.

22          MR. COOPER:  Your Honor, would you prefer that I

23 speak from the -- stand at the podium or the table?

24          THE COURT:  Whatever the court reporter wants.

25 Where would you prefer he be?

1            THE REPORTER:  I would prefer the podium.

2            THE COURT:  Then the podium it is.

3            MR. COOPER:  Your Honor, if it's okay with you, I

4    would like to make a brief opening statement before I call my

5    first witness.

6            THE COURT:  Very brief.  I've read all these papers,

7    so we need to get moving.

8            MR. COOPER:  Absolutely.

9            THE COURT:  Five minutes or less.

10           MR. COOPER:  Absolutely.  Your Honor, there are

11   really only three issues that need to be addressed here today.

12   Those issues are:  One, did the defendant destroy relevant

13   material evidence; two, at the time he did so, was he under a

14   duty to preserve that evidence; and, three, did the defendant

15   act with willfulness, fault, or bad faith?  The evidence that

16   will be presented here today, Your Honor, I believe, will show

17   that the answer to all three of those questions is yes.

18           As you know, this is a case where on-line copyright

19   infringement in which the plaintiff, Malibu Media, LLC,

20   alleges that the defendant, Michael Harrison, used his

21   computer to unlawfully infringe Plaintiff's copyrighted works

22   through the BitTorrent protocol.  The case was filed in August

23   of 2012, and Plaintiff -- against 11 John Doe defendants.

24   Plaintiff subsequently subpoenaed each of those defendant's

25   ISPs.

1          In this case, the defendant's ISP, Comcast, before

2    releasing the defendant's identifying information to the

3    plaintiff, sent the defendant a notice that informed him that

4    he had been identified, via Comcast records, as one of the

5    alleged infringers in this lawsuit.  That notice was sent in

6    September and received by the defendant in October of 2012.

7          Subsequently, in January of 2013, the defendant

8    discarded the hard drive to one of two computer devices that

9    were in use at the time of the alleged infringement.

10   Plaintiff was never afforded the opportunity to examine the

11   contents of that hard drive but, for good reason, believes

12   that had it been able to do so, it likely would have found

13   dispositive evidence on that hard drive.

14         Indeed, the evidence in this case is overwhelming.

15   The defendant admits that he destroyed the hard drive.  No one

16   saw him dispose of the hard drive.  The defendant admits to

17   having used BitTorrent.  He admits to having previously

18   engaged in "gratuitous" file sharing through the BitTorrent

19   protocol.  He admits to viewing adult content.  At the time of

20   the alleged infringement, Mr. Harrison lived in an apartment

21   by himself, and his wireless Internet was secured.

22         Again, Your Honor, by throwing away that hard drive,

23   the discarding of it at GGI Recycling, where the defendant

24   previously worked, he ensured that nobody would be able to

25   determine the examine -- I'm sorry, that nobody would be able

 1  to determine the contents of that hard drive.  Accordingly,

 2  the plaintiff requests that the Court enter sanctions against

 3  the defendant.

 4          That being said, I would like to call our first

 5  witness, the defendant, Michael Harrison, to the stand.

 6          THE COURT:  Mr. Harrison, right here.  Would you

 7  raise your right hand?

 8          (The witness is sworn.)

 9          THE COURT:  Please be seated.

10      **MICHAEL PAUL HARRISON, PLAINTIFF'S WITNESS, SWORN**

11                  **DIRECT EXAMINATION**

12  BY MR. COOPER:

13  Q.  Good morning, Mr. Harrison.

14  A.  Good morning.

15  Q.  Could you state your full name for the record?

16  A.  Michael Paul Harrison.

17  Q.  Mr. Harrison, you're the defendant in this lawsuit,

18  correct?

19  A.  Yes.

20  Q.  Where did you go to school, Mr. Harrison?

21  A.  I went to school at Indian Creek High School.

22  Q.  Mr. Harrison, you can read, right?

23  A.  Yes, sir.

24  Q.  And you don't have any sort of reading disability, do you?

25  A.  No, sir.

1  Q.  Mr. Harrison, are you currently under the influence of any

2  drug or other medication that may affect your memory?

3  A.  No.

4  Q.  Mr. Harrison, during the time of the alleged infringements

5  in this lawsuit, you lived at 1044 Ventura Court, Apartment A,

6  Greenwood, Indiana, is that correct?

7  A.  Yes.

8  Q.  Until August of 2013, when your girlfriend moved in with

9  you, you lived there by yourself, right?

10  A.  Yes.

11  Q.  At the time of the alleged infringement in this case, you

12  had only two computer devices that you used, is that correct?

13  A.  Yes.

14  Q.  And those two computers were your Acer laptop and your

15  custom-built gaming computer, is that right?

16  A.  Yes.

17  Q.  And at the time of the alleged infringements, your

18  wireless Internet signal was password protected, correct?

19  A.  Yes.

20  Q.  And also encrypted, right?

21  A.  Yes.  I believe so.

22  Q.  Mr. Harrison, you know what BitTorrent is, correct?

23  A.  Yes.

24  Q.  And you've used BitTorrent before, haven't you?

25  A.  Yes.

1  Q.  And I believe you previously testified that you first

2  learned about BitTorrent when you were about 16 years old?

3  A.  Yes.

4  Q.  And you're now 24?

5  A.  Yes.

6  Q.  Mr. Harrison, isn't it true that you previously used

7  BitTorrent for "gratuitous" file sharing?

8  A.  Yes.

9  Q.  And you admit that you have a BitTorrent client, uTorrent,

10 installed on your Acer laptop?

11 A.  Yes.

12 Q.  Mr. Harrison, you understand that BitTorrent, when you use

13 it, it creates a copy of a file onto your computer's hard

14 drive, right?

15 A.  Yes.

16 Q.  And you've been to torrent Web sites before, correct?

17 A.  Yes.

18 Q.  Mr. Harrison, in October of 2012, you received a letter

19 from your Internet service provider, is that correct?

20 A.  Yes.

21         MR. COOPER:  Your Honor, I have in my hand what's

22 been previously marked as Plaintiff's Exhibit P1 for

23 identification purposes only.  Showing it to Mr. Quearry.

24         May I approach the witness, Your Honor?

25         THE COURT:  You may.

Case 1:12-cv-01117-WTL-MJD   Document 293   Filed 12/22/14   Page 11 of 106 PageID #: 2296

 1  BY MR. COOPER:

 2  Q.  I'm now showing the witness what's been previously marked

 3  as Plaintiff's P1 for identification purposes.

 4          MR. COOPER:  I'm sorry.  Your Honor, I have a copy

 5  for you, as well.

 6          THE COURT:  Okay.  Thank you.

 7  BY MR. COOPER:

 8  Q.  Mr. Harrison, do you recognize this document?

 9  A.  Yes.

10  Q.  And what is this document?

11  A.  It's the letter that was sent to me in October of 2012 --

12  or 20 -- yeah.

13          MR. COOPER:  Your Honor, I move that Plaintiff's

14  Exhibit P1 be admitted into evidence.

15          THE COURT:  Objection?

16          MR. QUEARRY:  No, Your Honor.

17          THE COURT:  So admitted.

18          MR. COOPER:  Thank you.

19                          (Plaintiff's Exhibit P1 was

20                          received in evidence.)

21  BY MR. COOPER:

22  Q.  Mr. Harrison, this letter says "Comcast" at the top,

23  correct?

24  A.  Yes.

25  Q.  And below that, you see it's addressed to Michael

1  Harrison, 1044 Ventura Court, Apartment A, Greenwood Indiana,

2  46143, correct?

3  A.  Yes.

4  Q.  And you see right below that where it says, "Malibu Media,

5  LLC, v. John Does 1 - 11"?

6  A.  Yes.

7  Q.  And then you see where it starts -- the letter starts,

8  "Dear Michael Harrison," right?

9  A.  Yes.

10 Q.  Mr. Harrison, would you read out loud for the Court the

11 first sentence?  I marked a small number "1" by it.

12 A.  "Malibu Media, LLC, has filed a federal lawsuit in the

13 United States District Court for the Southern" Indiana --

14 "Southern District of Indiana."

15 Q.  And you understand that that sentence means that Malibu

16 Media, LLC, my client, has filed a lawsuit in federal court,

17 right?

18 A.  Yes.

19 Q.  Would you mind reading the second sentence, please?

20 A.  The whole sentence or just the part that's underlined?

21 Q.  No.  The whole sentence, please.

22 A.  "You have been identified in our records via your assigned

23 Internet protocol (IP) address, which is unique to each"

24 individual -- "each Internet user, in this lawsuit for

25 allegedly infringing Malibu Media, LLC's, copyrights on the

1  Internet by uploading or downloading a movie without

2  permission."

3  Q.  And would you mind reading just the underlined portions of

4  that sentence aloud, please?

5  A.  "You have been identified...in this lawsuit for allegedly

6  infringing Malibu Media, LLC's, copyrights."

7  Q.  And you understand that that means that Comcast is

8  informing you that you have been identified as one of the

9  alleged infringers in this lawsuit, correct?

10          MR. QUEARRY:  Objection.  Objection, Your Honor.

11          THE COURT:  Basis?

12          MR. QUEARRY:  It does not say that the defendant was

13  identified.  It says that his IP address was identified.

14          THE COURT:  Overruled.  You can answer.

15          MR. COOPER:  You can answer the question.

16  A.  I would have to -- I saw that the IP address had been

17  identified.  "You have been identified," would say the IP

18  address.  I had been identified by an IP address that I owned,

19  I guess.

20  BY MR. COOPER:

21  Q.  I'm sorry.  I'm not sure that I understand your answer.  I

22  just -- with regard to the underlined portion, you said that

23  you do understand that that means that Comcast is notifying

24  you that you have been identified as one of the alleged

25  infringers, correct?

1    A.  Yes.

2    Q.  Mr. Harrison, would you read the sentence that's marked

3    with a small number "3"?  It starts with, "The court has

4    ordered..."

5    A.  "The Court has ordered Comcast to supply your name,

6    address and other information to Malibu Media, LLC, in the

7    attached Order and accompanying Subpoena."

8    Q.  And you understand that that sentence means that the Court

9    has ordered Comcast to turn over your information, is that

10   correct?

11   A.  Yes.

12   Q.  Specifically, they were ordered to turn over your name,

13   address, and other information, right?

14   A.  Yes.

15   Q.  And can you read the sentence marked with the small number

16   "4"?

17   A.  "The case has been assigned Docket Number 1:2-cv-01117

18   (sic) by the court."

19   Q.  And you understand that that meant -- sentence means that

20   a specific docket number was assigned to this case, correct?

21   A.  Yes.

22   Q.  Can you read the sentence with the small number "5,"

23   please?

24   A.  "If you have any questions about the lawsuit, you should

25   consult an attorney immediately.  Comcast cannot and will not

1  provide any legal advice."

2  Q.  So you understand that that means if you don't understand

3  anything or you have questions, you should consult with an

4  attorney, right?

5  A.  Yes.

6  Q.  Can you read the sixth sentence, please, which starts

7  with, "Comcast will provide..."?

8  A.  "Comcast will provide your name, address and other

9  information as directed in the Order unless you or" an

10 "attorney file something with the Southern District of Indiana

11 such as a motion to quash or vacate the Subpoena no later than

12 October 29, 2012."

13 Q.  And you understand that that sentence means that there's a

14 deadline by which you or your attorney were required to file

15 something; otherwise, Comcast will turn over your identifying

16 information, correct?

17 A.  Yes.

18 Q.  Finally, can you read the last sentence that's with the

19 number "7," please?  At the very bottom.

20 A.  "If you have" any -- "if you have legal questions" in

21 "this matter, please contact an attorney."

22 Q.  And you understand, again, that they are advising you to

23 contact an attorney if you have any questions about this,

24 correct?

25 A.  Yes.

1  Q.  Mr. Harrison, after you received this notice, you did not

2  contact an attorney, did you?

3  A.  No.

4  Q.  But you did change your wireless Internet password,

5  correct?

6  A.  Yes.

7  Q.  And you did do a little bit of on-line research, right?

8  A.  Yes.

9  Q.  Mr. Harrison, you're capable of understanding the contents

10 of this letter?

11 A.  Yes.

12 Q.  And from reading this letter, you understood that in some

13 way, your IP address was associated with on-line copyright

14 infringement, right?

15 A.  Yes.

16 Q.  And that's the reason you changed your Internet password?

17 A.  Yes.

18 Q.  Mr. Harrison, I would like to change topics here for a

19 minute and talk about the hard drive that was in your gaming

20 computer.  You have a custom-built gaming computer, is that

21 correct?

22 A.  Yes.

23 Q.  And you also have an Acer laptop?

24 A.  Yes.

25 Q.  And at the time of the alleged infringement, those were

1  the only two computer devices that were in use, correct?

2  A.  Yes.

3  Q.  Around January of 2013, you claim that the hard drive to

4  your gaming computer crashed, is that right?

5  A.  Yes.

6  Q.  And you subsequently disposed of that hard drive at GGI

7  Recycling, where you had formally worked, right?

8  A.  Yes.

9  Q.  When you disposed of that drive in January of 2013, you

10  had already received this notice from Comcast, right?

11  A.  Yes.

12  Q.  And when you took the hard drive to GGI Recycling and you

13  dropped it in the recycling bin, that was the last time that

14  you saw that hard drive?

15  A.  Yes.

16  Q.  And, presumably, that hard drive was then recycled by GGI,

17  right?

18  A.  Yes.

19  Q.  Mr. Harrison, electronics that get dropped off at GGI

20  Recycling are generally crushed and melted, is that correct?

21  A.  Yes.

22  Q.  Mr. Harrison, you didn't make a copy of the contents of

23  the gaming computer hard drive at any point, did you?

24  A.  No.

25  Q.  And you didn't transfer any files from the gaming computer

1  hard drive to the replacement hard drive that you purchased

2  after you discarded the hard drive, correct?

3  A.  No.

4  Q.  I'm sorry.  You did not transfer any files, correct?

5  A.  Oh, yes.  I did not.

6  Q.  And no one besides yourself examined the hard drive prior

7  to taking it to GGI Recycling?

8  A.  Yes.

9  Q.  And neither the hard drive itself nor any copy of its

10  contents was provided to the plaintiff in this matter, right?

11  A.  Yes.

12          (Off the record.)

13  BY MR. COOPER:

14  Q.  I'm sorry.  Besides you, nobody saw the hard drive crash,

15  is that correct?

16  A.  Yes.

17  Q.  And you never gave the hard drive to any third party to

18  examine to see if they could recover any data from it, did

19  you?

20  A.  No.

21  Q.  Mr. Harrison, you're not an expert in data recovery, are

22  you?

23  A.  No.

24  Q.  And you never had any third party corroborate the fact

25  that the hard drive had crashed?

1   A.  No.

2   Q.  So you're the only person with personal knowledge of the

3   hard drive crashing, right?

4   A.  Yes.

5   Q.  Mr. Harrison, let's talk now about the replacement hard

6   drive that was purchased and installed in your computer after

7   you disposed of the gaming computer hard drive.  So after your

8   hard drive crashed in January of 2013 and you discarded it,

9   you had a friend, Mr. John Harlan, purchase a replacement hard

10  drive for you, correct?

11  A.  Yes.

12  Q.  And that replacement was purchased in January of 2013?

13  A.  Yes.

14  Q.  And you installed that hard drive into your computer

15  sometime shortly thereafter?

16  A.  Yes.

17  Q.  Mr. Harrison, do you recall making copies of your computer

18  hard drives to give to the plaintiff for examination in this

19  lawsuit?

20  A.  Yes.

21  Q.  And you made those copies yourself, right?

22  A.  Yes.

23  Q.  Mr. Harrison, do you know what a write blocker is?

24  A.  No.

25  Q.  So you didn't use a write blocker when you created the

1   copies of the hard drive?

2   A.  No.

3   Q.  And, again, you made copies of both of your hard drives,

4   correct, the Acer laptop and the gaming computer?

5   A.  Yes.

6   Q.  And it was a copy of the replacement hard drive that you

7   made, correct?

8   A.  Yes.

9   Q.  Mr. Harrison, do you recall responding to Plaintiff's

10  first request for production of documents?

11  A.  Can you specify more?

12  Q.  Well, in this case, the plaintiff sent you a number of

13  requests for production, and they were seeking documents from

14  you.  Do you recall responding to those?

15  A.  Not particularly.

16          MR. COOPER:  Your Honor, may I approach the witness?

17          THE COURT:  You may.

18  BY MR. COOPER:

19  Q.  Please just review these for a minute and let me know when

20  you're done.

21          (Off the record.)

22  A.  Yes.

23  BY MR. COOPER:

24  Q.  Specifically, can you review page 5, the first paragraph?

25          MR. QUEARRY:  Your Honor, may I request a copy of

1  the document that Mr. Harrison is --

2              THE COURT:  Do you have a copy?

3              MR. COOPER:  I do.

4              MR. QUEARRY:  Thank you.

5              MR. COOPER:  I have a copy for you, as well, Your

6  Honor.

7              THE COURT:  Thank you.

8  BY MR. COOPER:

9  Q.  Have you reviewed it?

10 A.  I just looked enough to remember seeing the document

11 before.

12 Q.  Okay.  Mr. Harrison, the document I had you receive is

13 Plaintiff's Exhibit marked P3 for identification purposes

14 only.  And you do recall responding to those requests for

15 production, correct?

16 A.  Yes.

17 Q.  And this is a copy of the requests that were served on

18 you?  Yes?

19 A.  Yes.

20             MR. COOPER:  Your Honor, I move that Plaintiff's

21 Exhibit P3 be admitted into evidence.

22             THE COURT:  Objection?

23             MR. QUEARRY:  Your Honor, there was a general

24 objection to -- inserted into the defendant's responses.  I do

25 not object to the admissibility of the plaintiff's request if

 1  that objection is also permitted to be entered into evidence.

 2          THE COURT:  Well, you can put it into evidence.

 3          MR. QUEARRY:  Okay.

 4          THE COURT:  All right.  So admitted.

 5                  (Plaintiff's Exhibit P3 was

 6                  received in evidence.)

 7  BY MR. COOPER:

 8  Q.  Mr. Harrison, you recall responding to these requests,

 9  correct?

10  A.  Yes.

11  Q.  Would you mind reading aloud on page 5 the first paragraph

12  marked number "1"?

13  A.  "If you at any time had possession, custody or control of

14  the document called for under this request and if such

15  document has been lost, destroyed, purged, or is not presently

16  in your possession, custody or control, you shall describe the

17  document, the date of its loss, destruction, purge, or

18  separation from possession, custody or control and the

19  circumstances surrounding its loss, destruction, purge, or

20  separation from possession, custody or control."

21  Q.  Mr. Harrison, you understand that that means that if there

22  were documents that were lost or destroyed, you were required

23  to describe those documents, right?

24  A.  Yes.

25          MR. QUEARRY:  Objection.  Your Honor, I'm going to

1  object on the basis of the general objection that was

2  inserted.

3           THE COURT:  Can you articulate more fully your

4  objection?

5           MR. QUEARRY:  Yes.  The -- a response for a request

6  for production in the form submitted by the plaintiff is

7  essentially a request for Mr. Harrison -- or for the defendant

8  to answer -- provide answers in the form and substance of

9  interrogatories.  And they submitted 25 interrogatories, I

10  believe, with the request, as well.  So, according to the

11  Federal Rules of Civil Procedure, Mr. -- or, I'm sorry.  The

12  defendant is not required to articulate answers to a response

13  for a production in the form and substance of an

14  interrogatory.

15           THE COURT:  As I understood the question, it was

16  asking for Mr. Harrison's understanding of his responsibility,

17  so I'll let Mr. Harrison respond to the question.  I think you

18  will be able to clarify this on cross-examination, because I

19  understand who prepared the responses.

20           MR. QUEARRY:  Thank you, Your Honor.

21  BY MR. COOPER:

22  Q.  So, Mr. Harrison, you understand what that first paragraph

23  was telling you, correct?

24  A.  Yes, I believe so.

25           MR. COOPER:  Your Honor, I have in my hand what's

1  been previously marked as Plaintiff's P4 for identification

2  purposes.  I'm showing it to Mr. Quearry.

3          May I approach the witness?

4          THE COURT:  You may.  You have ongoing permission to

5  approach the witness as needed.

6          MR. COOPER:  Thank you, Your Honor.

7  BY MR. COOPER:

8  Q.  Mr. Harrison, do you recognize this document?

9  A.  Yes.

10  Q.  And what is this document?

11  A.  My responses.

12  Q.  Mr. Harrison, can you please turn to page 2 of your

13  responses and read your response to Plaintiff's first request

14  for production out loud, please?

15  A.  Did you say my response?

16  Q.  Yes, your response to Plaintiff's first request for

17  production.

18  A.  "Plaintiff was provided a complete copy of the hard drive

19  for each of my" -- computers -- "computer devices on July 25,

20  2013."

21  Q.  Mr. Harrison, your response to Plaintiffs first request

22  for production does not mention the hard drive that was

23  discarded in January 2013, does it?

24  A.  No.

25  Q.  You previously testified that a copy of the contents of

1  that hard drive was not provided to the plaintiff in this

2  case, correct?

3  A.  I'm sorry.  Could you reask the question?

4  Q.  A copy of the contents of the crashed gaming computer hard

5  drive, which you threw away, was not provided to the plaintiff

6  in this lawsuit, is that right?

7  A.  Yes.

8  Q.  Mr. Harrison, you don't have any evidence, besides your

9  word alone, to support your assertion that Plaintiff's movies

10  were not on the hard drive that crashed, do you?

11        MR. QUEARRY:  Objection, calls for a legal

12  conclusion.

13        THE COURT:  Overruled.  You can answer.

14  A.  Can you repeat the question?

15  BY MR. COOPER:

16  Q.  You don't have any evidence, besides your word alone, to

17  support the assertion that Plaintiff's movies were not on the

18  hard drive that crashed and which you disposed of, correct?

19  A.  Yes.

20  Q.  I'm sorry?

21  A.  I'm sorry.  Yes, I believe -- the question is confusing.

22  Q.  I'm merely trying to get at, you don't have any outside

23  evidence to prove that Malibu Media's works were not on that

24  hard drive, do you?

25  A.  Correct.

1  Q.  And you were the only person to see that hard drive

2  supposedly crash, right?

3  A.  Correct.

4  Q.  And you were the only person that knew the exact contents

5  of that computer's hard drive, correct?

6  A.  Correct.

7  Q.  And no one saw you dispose of that hard drive at GGI

8  Recycling?

9  A.  Correct.

10         MR. COOPER:  Your Honor, may I have a moment,

11  please?

12         THE COURT:  You may.

13         (Off the record.)

14         MR. QUEARRY:  Your Honor, I would request

15  Mr. Harrison to speak up a little bit so I can hear his

16  answers, please.

17         THE COURT:  You might move the mic a little bit

18  closer to you or maybe you move a little closer to the mic.

19         THE WITNESS:  I'll move closer.

20         (Off the record.)

21         MR. COOPER:  Thank you, Your Honor.

22  BY MR. COOPER:

23  Q.  Just a few more questions, Mr. Harrison.  Mr. Harrison,

24  your Internet service provider at the relevant time was

25  Comcast, correct?

1  A.  Yes.

2  Q.  And at the time you registered for your Internet service

3  with Comcast, did you provide them with -- you provided them

4  with an e-mail address, correct?

5  A.  Yes.

6  Q.  And did you provide them with the e-mail address

7  sammywalton44@comcast.net?

8  A.  No.

9  Q.  Do you know that four DMCA notices were sent by Comcast to

10  that e-mail address?

11  A.  No.

12          MR. QUEARRY:  Objection, hearsay.

13          MR. COOPER:  I'm sorry, Your Honor.  We'll connect

14  up through the deposition of the Comcast 30(b)(6) corporate

15  representative, the fact that an e-mail address

16  sammywalton44@comcast.net was registered to the defendant,

17  Michael Harrison, in this case.

18          MR. QUEARRY:  Your Honor, those were during the

19  deposition, which I don't believe at this point I have the

20  proper release from Attorney John Siefert to speak about.

21  Mr. Siefert provided a release of confidentiality of the

22  transcript to the plaintiff, but has not gotten back to me on

23  that.  And there are key portions of the transcript that

24  refutes Plaintiff's claims in that regard; which sustains the

25  hearsay objection, I might add, as well.

1          THE COURT:  Well, the whole transcript is going to

2    have to come in if it's coming in at all.  We're not going to

3    put in portions of it.  Does the plaintiff have the authority

4    to put the whole transcript in?

5          MR. COOPER:  Not at this time, no, Your Honor.

6          THE COURT:  Under -- how not?

7          MR. LIPSCOMB:  Your Honor, may I?

8          THE COURT:  Yes.

9          MR. LIPSCOMB:  Yes, Your Honor, we can put the whole

10   transcript in.  Comcast would like us to keep it confidential,

11   but there's no protective order or no rule that requires us to

12   do so, and we're going to put the whole thing in.

13         THE COURT:  Okay.  Then I'm going to allow the

14   question.  I'm not going to rule on the hearsay objection.

15   I'll hold the hearsay objection pending the plaintiff's

16   ability to tie this all together.  If the plaintiff can't tie

17   it together, I'll sustain the hearsay objection.

18         MR. QUEARRY:  Thank you, Your Honor.

19         THE COURT:  You can answer the question.

20   A.  Can you repeat the question?

21   BY MR. COOPER:

22   Q.  The question was, did you provide Comcast with the e-mail

23   address sammywalton44 at the time you registered for your

24   Comcast account?

25   A.  No.

 1          MR. COOPER:  Can I have one more moment, Your Honor,

 2   please?

 3          THE COURT:  Yes.

 4          MR. COOPER:  Thank you.

 5          (Off the record.)

 6          MR. COOPER:  Your Honor, I have no further questions

 7   for this witness.

 8          THE COURT:  Okay.  Mr. Quearry, you can

 9   cross-examine Mr. Harrison now or you can defer your

10   cross-examination until your case.

11          MR. QUEARRY:  I'll proceed with cross-examination,

12   Your Honor.

13          THE COURT:  All right.

14                    **CROSS EXAMINATION**

15   BY MR. QUEARRY:

16   Q.  Mr. Harrison, when did you receive the September 27, 2012,

17   Comcast letter?

18   A.  Sometime in October.

19   Q.  Do you remember when specifically in October you received

20   that letter?

21   A.  No, I do not.

22   Q.  Did the Comcast letter that you received state that you

23   were a defendant in a lawsuit for copyright infringement?

24   A.  No.

25   Q.  Did the letter that you received state that you could be

1   at some point in time a defendant in a lawsuit for copyright

2   infringement?

3   A.  Yes.

4   Q.  Where -- I'll refer you to Plaintiff's Exhibit 1.

5            MR. QUEARRY:  May I approach the witness, Your

6   Honor?

7            THE COURT:  Yes.

8            MR. QUEARRY:  May I have continuing permission to

9   approach?

10           THE COURT:  You may.  Everybody may.

11           MR. QUEARRY:  Thank you, Your Honor.

12           THE COURT:  That's Exhibit P1.

13  BY MR. QUEARRY:

14  Q.  Mr. Harrison, where in that letter that you received does

15  it state that you could be at some point in time a defendant

16  in a lawsuit for copyright infringement?

17  A.  When it says, "You have been identified in our records via

18  your assigned Internet protocol."

19  Q.  Does that say that you could be a defendant?

20  A.  In the future.  In the future, yes.

21  Q.  Did the September 27, 2012, Comcast letter state that you

22  would be a defendant in a lawsuit for copyright infringement

23  in the future?

24           MR. NICOLETTI:  Objection, Your Honor, asked and

25  answered.

1       MR. QUEARRY:  I believe it was a different question,

2  Your Honor.

3       THE COURT:  Overruled.  You may answer.

4  A.  Can you repeat the question, please?

5  BY MR. QUEARRY:

6  Q.  Does the Comcast letter that you received, and which you

7  currently have in front of you, state that you -- I'm sorry,

8  that you would be a defendant in a lawsuit for copyright

9  infringement in the future?

10  A.  Not specifically.

11       THE COURT:  Just a moment.  It's Mr. Cooper's

12  witness, so Mr. Cooper needs to be making the objections.

13  Please proceed.

14       MR. QUEARRY:  Thank you, Your Honor.

15  BY MR. QUEARRY:

16  Q.  Does the Comcast letter state that you should not discard

17  or dispose of any computer hard drives or electronic devices

18  following your receipt of the letter?

19  A.  No.

20  Q.  Does the letter state that you should keep and preserve

21  all of your computer hard drives and electronic devices

22  following your receipt of the letter?

23  A.  No.

24  Q.  Does the letter you received state that you could be

25  forced to turn over any of your computer hard drives or

*HARRISON - CROSS/QUEARRY*                32

1  electronic devices to someone else for inspection in the

2  future?

3  A.  No.

4  Q.  After receiving the letter, did you think that you were a

5  defendant in a lawsuit for copyright infringement?

6  A.  No.

7  Q.  After receiving -- I'm sorry.  Is that too --

8           THE COURT:  You're all right.  It's your booming

9  voice.

10 BY MR. QUEARRY:

11 Q.  After receiving the letter, did you think that you ever

12 would be a defendant in a lawsuit for copyright infringement?

13 A.  No.

14 Q.  After receiving the letter, did you think you would ever

15 have to turn over any of your computer hard drives or devices

16 to someone else in connection with a lawsuit?

17 A.  No.

18 Q.  After receiving the letter, you immediately changed your

19 Wi-Fi password for connecting to the Internet, correct?

20 A.  Correct.

21 Q.  If you were the infringer, why would you change your Wi-Fi

22 password?

23 A.  No reason.

24 Q.  In your interrogatory response number 4, why did you

25 specifically refer to your gaming computer as a gaming

1  computer?

2  A.  Because that's all that it's used for.

3  Q.  Is your gaming computer a desktop computer or a laptop

4  computer?

5  A.  Desktop.

6  Q.  Did you build your gaming computer?

7  A.  Yes.

8  Q.  Did you build your gaming computer to use for computer

9  gaming?

10  A.  Yes.

11  Q.  When did you build it?

12  A.  In 2007, I believe.

13  Q.  How did you know how to build a gaming computer?

14  A.  I had done research and I had worked on computers some.

15  Q.  Mr. Harrison, can you scoot up to the microphone just a

16  little bit for me?  I'm having a hard time hearing you.

17  A.  Yes.

18  Q.  Thank you.  Can you repeat your answer, please?

19  A.  Can you repeat your question, please?

20  Q.  Sure.  How did you know how to build a gaming computer?

21  A.  I had worked on computers before, and I had done research.

22  Q.  Have you built any other computers?

23  A.  Yes.

24  Q.  How many computers do you think you've built?

25  A.  Ten or more.

1  Q.  How long have you been building computers?

2  A.  Since -- probably since I was 16 or 17.  2006 or 2007.

3  Q.  Do you know how to program computers or write program

4  codes?

5  A.  No.

6  Q.  Do you know any programming languages?

7  A.  No.

8  Q.  Did you build your gaming computer with a certain type of

9  hard drive?

10  A.  No.

11  Q.  What kind of hard drive was the original hard drive in the

12  gaming computer?

13  A.  It was a SATA disk drive.

14  Q.  Did you ever replace the original gaming computer hard

15  drive that you built in 2007?

16  A.  Yes.  Many times.

17  Q.  What caused you to replace the original gaming hard drive?

18  A.  It crashed.

19  Q.  When you say the original gaming hard drive crashed, what

20  specifically do you mean by the word "crashed"?

21  A.  Usually they will start having corruption issues and

22  functionality issues, and eventually they will stop working

23  entirely or just start clicking when they refuse -- the

24  computer refuses to recognize them.

25  Q.  When you were -- when you use the word "crash" to speak

1  about a computer hard drive, are you saying that you always

2  mean it in the sense that the hard drive is no longer usable?

3  A.  Yes.

4  Q.  Do you remember what you did with the original gaming hard

5  drive after it was replaced?

6  A.  I took it to GGI.

7  Q.  And GGI is --

8  A.  The electronics recycling company that I used to work for.

9  Q.  And do you remember when you replaced the first gaming

10  computer hard drive?

11  A.  The first one?  The first one I put in the computer in

12  2007?

13  Q.  Yes.

14  A.  I would assume probably about a year after I built it.

15  Q.  Did you ever have to replace the hard drive in the gaming

16  computer after that?

17  A.  Yes.  Several times.

18  Q.  How many replacement hard drives have you put in the

19  gaming computer since 2007?

20  A.  I would say somewhere between four and six.

21  Q.  Why have you had to replace the hard drive in the gaming

22  computer between four and six times?

23  A.  Because gaming is really hard on computer hardware.

24  Q.  And why is it hard on computer hardware?

25          MR. COOPER:  Objection, foundation.

1          THE COURT:  Can you lay a foundation?

2          MR. QUEARRY:  I'm sorry?

3          THE COURT:  Can you lay a foundation for his

4   understanding of that question?

5          MR. QUEARRY:  Yes.  I'll get to -- I'll come back to

6   that, then.

7   BY MR. QUEARRY:

8   Q.  Were each of the replacement gaming hard drives SATA

9   drives?

10  A.  They were all SATA drives, but -- all of them but the last

11  one was a disk drive.  The last one was a solid state.

12  Q.  Can you explain what a SATA drive is?

13  A.  SATA is the connection type of the data cable.

14  Q.  And what is the difference between a SATA drive and a

15  solid state drive?

16          MR. COOPER:  Objection.  Sorry.  The same objection

17  as before, foundation.

18          THE COURT:  Overruled.  You can answer.

19  A.  The SATA is the data connection on a drive.  So a solid

20  state drive would still have a data connection.  The

21  difference is the disk type that is in it, which would also --

22  a hard disk drive would also have a SATA connection, and a

23  solid state would have a SATA connection.

24  BY MR. QUEARRY:

25  Q.  With the exception of the hard drive that John Harlan

1  purchased for you, that is the subject of this hearing, do you

2  remember what you did with each of the old crashed hard drives

3  after you replaced them with new ones in the gaming computer?

4  A.  I would have recycled them in whatever way, like whoever I

5  knew that recycled electronic equipment at the time.

6  Q.  Why wouldn't you keep any of those hard drives?

7  A.  Because they were crashed.  Like, there was no reason to

8  keep them.  They were nonfunctioning.

9  Q.  Okay.  And why did you choose to recycle or scrap the hard

10  drives rather than throw them in the trash?

11  A.  Because it's the -- it's electronics recycling, like

12  electronic components, so they -- people -- other people can

13  get money for recycling them.  And they are harmful, most of

14  the time, if they're just dumped in a landfill.

15  Q.  With the exception of the hard drive John Harlan bought

16  for you, where did you purchase replacement drives for the

17  gaming computer?

18          MR. COOPER:  Objection, relevance.

19          MR. QUEARRY:  Your Honor, it's relevant to the

20  reasons that John Harlan purchased the SSD hard drive for the

21  defendant, and it goes to the reason for the destruction of

22  the hard drive.  John Harlan's purchase of the hard drive

23  occurred prior to the destruction of the gaming hard drive.

24          THE COURT:  Overruled.  You can answer.

25  A.  Can you repeat the question, please?

1  BY MR. QUEARRY:

2  Q.  Yes.  With the exception of the hard drive John Harlan

3  bought for you, where did you purchase replacement drives for

4  the gaming computer?

5  A.  Most of the hard drives were just given to me.

6  Q.  Do you remember who gave them to you?

7  A.  Friends, family members, whoever I might have been working

8  on their computer.  Most of the hard drives I got were ones

9  that had come out of nonfunctioning units, but the hard drive

10 was still good.

11 Q.  Did you build computers for other people?

12 A.  Yes.

13 Q.  Who else did you build computers for?

14 A.  Friends, family.

15 Q.  And why did you build computers for your friends and

16 family?

17 A.  Because if you build a computer from parts instead of

18 buying one, like from a store, they end up being cheaper and

19 most often, like, superior in performance.

20 Q.  Okay.  Is it necessary for a gaming computer to have a

21 certain kind of graphics card?

22 A.  Yes.

23 Q.  And why is that necessary?

24          MR. COOPER:  Objection, relevance.

25          THE COURT:  Overruled.

1  A.  For the most part, you need a -- for gaming, you need a

2  high-end or high-performance, more expensive, better card.

3  BY MR. QUEARRY:

4  Q.  Okay.  And can you explain what a graphics card is?

5  A.  A graphics card is what turns the data inside the computer

6  into something you can see on the screen, essentially.

7  Q.  Does a gaming computer need a higher processing -- need a

8  graphics card with a higher processing capability?

9  A.  Yes.

10  Q.  Does it need a graphics card with more video memory?

11  A.  Yes.

12  Q.  What kind of graphics card did you build your gaming

13  computer with?

14  A.  An NVIDIA 8800 GS Superclocked.

15  Q.  Did you ever acquire any further graphics cards?

16  A.  At some point I acquired a second one and put it --

17  added it to the computer and linked the two together to work

18  as one.

19  Q.  And why did you link the graphics cards together?

20  A.  Because buying a second graphics card was cheaper than

21  buying -- buying a second graphics card and linking it

22  together was cheaper than buying two graphics cards -- or

23  another -- a newer graphics card that had the same capability

24  as the two linked together.

25  Q.  Okay.  Have you ever added or replaced any other hardware

1  in the gaming computer?

2  A.  I added a couple of sticks of RAM.

3  Q.  Can you explain what you mean by "sticks of RAM"?

4  A.  Random access memory, which is used by the computer to run

5  multiple processes at a time.

6  Q.  Okay.  And why did you add two sticks of RAM to the gaming

7  computer?

8  A.  For gaming, you need quite a bit of RAM to be able to run,

9  like, high-intensity or demanding games.

10  Q.  Did you build the gaming computer according to gaming

11  specifications to make the game playable?

12  A.  Yes.

13  Q.  Mr. Harrison, do you know what a frame rate is?

14  A.  Yes.

15  Q.  What is a frame rate?

16  A.  Frame rate is the frames per second rendered by the

17  computer from the game.

18  Q.  And do games have to have a certain frame rate in order to

19  be playable?

20  A.  Yes.

21  Q.  And why is that?

22  A.  The human eye can detect anything under 30 frames per

23  second, so you must keep it above 30 frames per second.

24  Q.  And why is that?

25  A.  Because if it drops below 30, you will be able to see

*HARRISON - CROSS/QUEARRY*                41

1  choppiness or skipped frames, and it makes the game either

2  unplayable or less desirable to play, I guess.

3  Q.  Would that make it difficult to play multiplayer games?

4  A.  Yes.

5  Q.  Would it make it nearly impossible?

6  A.  Barely impossible, yes.

7  Q.  Just to clarify, that would -- would that make the game

8  also look noticeably bad in a single-player mode?

9           MR. COOPER:  Objection, relevance.

10          MR. QUEARRY:  Your Honor, this goes to the reasons

11  for the destruction of the hard drive.  Mr. Harrison used his

12  gaming computer for gaming purposes.  He is a serious gamer,

13  as further questioning will be shown.

14          THE COURT:  Quickly.  Overruled.

15          MR. QUEARRY:  Okay.

16  BY MR. QUEARRY:

17  Q.  And, Mr. Harrison, does that make the game also look

18  noticeably bad in the single-player mode?

19  A.  Yes.

20  Q.  Why?

21  A.  Because you will notice the choppiness.  And it makes it

22  hard to -- if you're in a shooting game or something, it makes

23  it hard to aim, because the camera will be jumping.

24  Q.  Mr. Harrison, are you a computer gamer?

25  A.  Yes.

1  Q.  When did you start gaming?

2  A.  Probably when I was 15, 16.

3  Q.  How often do you game?

4  A.  Most every day.

5  Q.  What are some of the games you play?

6  A.  Counter-Strike, Gary's Mod, simulators.

7  Q.  What type of simulators?

8  A.  Like airplane simulators.  I have a farming simulator, of

9  all things.

10  Q.  You said farming simulator?

11  A.  Farming simulator.

12  Q.  Can you tell me about the game Gary's Mod?

13          MR. COOPER:  Objection, relevance.

14          THE COURT:  Overruled.

15  A.  Yes.  The game Gary's Mod involves giving you, within the

16  game, parts and tools to build anything you can think of.  You

17  can make a spaceship with life support systems and fly it to

18  other planets if you wanted to.  You can do anything you want.

19  BY MR. QUEARRY:

20  Q.  How many hours do you have logged in Gary's Mod?

21  A.  I think about 300 or so the last I looked.

22  Q.  300?  Can you see other players logged-in hours in Gary's

23  Mod?

24  A.  Yes.

25  Q.  Do you have a lot of hours compared to other players?

1  A.  I've only seen, I think, one person that had more than I

2  do.

3  Q.  Okay.  Just very quickly, can you also tell me about the

4  game Counter-Strike?

5  A.  Counter-Strike is a first person shooter.  It's one of the

6  older and more popular ones for PC.  It involves two teams

7  competing to either disarm or detonate a bomb or just wipe out

8  the other team.

9  Q.  And do you know how many hours you have logged for

10 Counter-Strike?

11 A.  There's two different ones.  I think I have about 150

12 hours in one of them and about 100 in the other.

13 Q.  Okay.  And is that a lot compared to other players?

14 A.  It's about an average amount.

15 Q.  Are these games first-person games?

16 A.  Yes.

17 Q.  Do all of these games present a simulated first-person

18 experience --

19 A.  Yes.

20 Q.  -- similar to reality?

21 A.  Yes.

22 Q.  And is that why these games require so much computer

23 processing power?

24 A.  Yes.

25 Q.  Do you play these games by connecting on-line to the

1   Internet?

2   A.   Yes.

3   Q.   Do you game with other people who are on-line?

4   A.   Yes.

5   Q.   Do you have friends who are gamers?

6   A.   Yes.

7   Q.   Okay.  Do you have a lot of friends who are gamers?

8   A.   A few, quite a few.

9   Q.   Have you ever gamed on-line with John Harlan?

10  A.   Yes.

11  Q.   Have you ever gamed at John Harlan's residence?

12  A.   Yes.

13  Q.   Have you ever gamed with John Harlan at any of your

14  residences?

15  A.   Yes.

16  Q.   Did John Harlan ever game with you at your apartment at

17  1044 Ventura Court in Greenwood, Indiana?

18  A.   Yes.

19  Q.   Did John Harlan game with you at that apartment at any

20  time from March 1st, 2012, to October 2012?

21  A.   I believe so.

22  Q.   Did Mr. Harlan personally see you gaming on your gaming

23  computer when he visited during that time frame?

24  A.   Yes.

25  Q.   Did Mr. Harlan ever game on your gaming computer when he

1   visited during that time frame?

2   A.  Yes.

3   Q.  Mr. Harrison, have you ever participated in a LAN party?

4   A.  Yes.

5   Q.  Can you explain what a LAN party is?

6           MR. COOPER:  Objection, Your Honor, relevance.

7           THE COURT:  It's L-A-N?

8           MR. QUEARRY:  Yes.

9           THE COURT:  Okay.

10          MR. QUEARRY:  Local area network, I believe.

11          THE COURT:  Okay.  What's your response to the

12  objection?

13          MR. QUEARRY:  Again, this is laying the foundation

14  for the reason for the destruction of the hard drive.  Your

15  Honor, if you've had enough --

16          THE COURT:  I'm getting the sense that Mr. Harrison

17  does a lot of gaming, but I'll overrule it.

18  A.  Can you repeat the question?

19  BY MR. QUEARRY:

20  Q.  Yes.  Will you explain what a LAN party is?

21  A.  A LAN party -- LAN stands for local area network.  That's

22  where you put multiple computers physically in the same place

23  and connect them physically to play games together.

24  Q.  So when you participate in the LAN parties, the computers

25  are actually physically connected together through a cable?

1  A.  Ethernet or they can be on Wi-Fi on the local network.

2  Q.  Why are the computers connected like that?

3  A.  Because if you connect on a local network, it's much

4  faster than connecting over the Internet to play games.

5  Q.  Do only serious gamers participate in LAN parties?

6  A.  I'm pretty sure that all the games that would be played at

7  a LAN party would only be for serious gamers, yes.

8  Q.  And why do you say that?

9  A.  Just your average gamer, I don't think, would play -- like

10  your average -- just a normal person that plays, you know,

11  FarmVille on Facebook is not going to be playing games that

12  would be necessary at a LAN party.

13  Q.  Mr. Harrison, is there anything that you, as a serious

14  gamer, purposely do not do on your gaming computer?

15  A.  Anything besides gaming.

16  Q.  And why is that?

17  A.  Anything else that you do on a computer tends to slow it

18  down.  The more programs you have installed, the slower the

19  computer gets.

20  Q.  Did you ever use your gaming computer for other purposes

21  besides gaming?

22  A.  Light Internet stuff, Facebook, YouTube.

23  Q.  How much memory does Facebook, YouTube, and simple

24  Internet use take up on a computer?

25  A.  As long as you close the program once you're done, like

1  before you go back to gaming, then none.

2  Q.  Okay.  Since the time you built your gaming computer, have

3  you used it only for gaming and limited Internet purposes

4  only?

5  A.  From the time that I built it, no.  At a certain point, it

6  became just a gaming computer.

7  Q.  When did you start using your gaming computer only for

8  gaming and limited Internet purposes?

9  A.  When I acquired the laptop sometime in 2009 or 2010.

10  Q.  So from 2009 or 2010 to the present date, you have used

11  your gaming computer only for gaming and limited Internet

12  purposes, is that correct?

13  A.  Yes.

14  Q.  Did you ever have a BitTorrent client installed on your

15  gaming computer?

16  A.  Maybe at some point before I had the laptop.  So before

17  2009 or 2010.

18  Q.  At any point after you got -- acquired your laptop, was a

19  BitTorrent client installed on your gaming computer?

20  A.  No.

21  Q.  Is the hard drive in the gaming computer that you sent to

22  Plaintiff the gaming hard drive that was in use from April of

23  2012 to October of 2012?

24  A.  No.

25  Q.  Is the hard drive you sent to Plaintiff the hard drive

1  that is currently in your gaming computer?

2  A.  Yes.

3  Q.  And when did you get the hard drive that is currently in

4  your gaming computer?

5  A.  In early February 2013.

6  Q.  When did you get the old gaming computer hard drive that

7  you replaced in February of 2013?

8  A.  I think in late 2011.

9  Q.  How did you get the old gaming computer hard drive in late

10  2011?

11  A.  Somebody gave it to me.  It came out of a computer that

12  had a bad motherboard.

13  Q.  If the motherboard in a computer goes bad, does that mean

14  the hard drive is bad, too?

15  A.  No.

16  Q.  Why not?

17  A.  Because they are two separate things that are just linked

18  through a cable.  But when one goes bad, the other is

19  generally good.

20  Q.  How did you know the motherboard was bad?

21  A.  All the capacitors were blown on it.  All the capacitors

22  were slit and leaking, is the way you know they're bad.

23  Q.  So you just took the good hard drive that was given to you

24  in late 2011 and put it into the gaming computer?

25  A.  Yes.

1  Q.  Is that the only hard drive that was in the gaming

2  computer from late 2011 to February of 2013?

3  A.  Yes.

4  Q.  What happened to the gaming hard drive that was given to

5  you in late 2011?

6  A.  It crashed in January of 2013.

7  Q.  When you say it crashed, again, what do you mean

8  specifically happened to the hard drive?

9  A.  With that one, the hard drive started having operating

10  system crashes and would refuse to boot back up.  Once it did,

11  it notified me that the hard drive was having corruption.  And

12  eventually the hard drive stopped booting entirely and started

13  clicking.

14  Q.  Was that hard drive usable any longer?

15  A.  No.  Once a hard drive starts clicking, there's nothing

16  that can be done with it.

17  Q.  Okay.  How did you acquire the new hard drive for your

18  gaming computer in 2013?

19  A.  John Harlan bought it for me.

20  Q.  Why did John Harlan buy you that hard drive?

21  A.  He owed me money.

22  Q.  What did he owe you money for?

23  A.  I had loaned him some money for some car parts.

24  Q.  How much money did you loan him?

25  A.  I think originally it was 400-something.  But he had paid

1   me some of it back.

2   Q.   Okay.  How much had he paid you back?

3   A.   The hard drive was 120, so whatever the difference between

4   120 and 400 is.

5   Q.   Do you remember when you loaned John Harlan the $400?

6   A.   No.  I don't have any idea.

7   Q.   Have you ever loaned John Harlan money or any other

8   property of yours prior to loaning him the $400?

9   A.   I think I loaned him a graphics card one time.  I think

10  that's it.

11  Q.   A graphics card for --

12  A.   Yes.

13  Q.   -- a gaming computer?

14  A.   For a computer.

15  Q.   That was John Harlan's?

16  A.   Yes.

17  Q.   Did you have a conversation with John Harlan about buying

18  the hard drive for you?

19  A.   Yes.

20  Q.   When did you have that conversation with him?

21  A.   The day that the hard drive was purchased.

22  Q.   Do you remember what day that was?

23  A.   It was late in January.  I think the 26th.  I think

24  January 26th, 2013.

25          MR. QUEARRY:  Your Honor, if I may just have a quick

1   second.

2          THE COURT:  You may.

3   BY MR. QUEARRY:

4   Q.  Mr. Harrison, do you recognize that document?

5   A.  Yes.

6          THE COURT:  Do you have a copy for them?

7          MR. QUEARRY:  I sent them -- I do not currently.

8          THE COURT:  What is it?

9          MR. QUEARRY:  I'm sorry?

10          THE COURT:  What is it?

11          MR. QUEARRY:  It is the receipt for the purchase of

12   the gaming hard drive.

13          THE COURT:  Do you all have a copy of that?

14          MR. COOPER:  I think I have a copy of it with me,

15   maybe.

16          THE COURT:  Why don't you show it to Mr. Cooper.

17          MR. COOPER:  Yeah, Your Honor, I actually have a

18   copy of that with me.

19          THE COURT:  Okay.

20          MR. COOPER:  So that's okay.  Can I actually inspect

21   just to see that it's the same one?

22          MR. QUEARRY:  Sure.  Sorry about that.

23          MR. COOPER:  Thank you.

24   BY MR. QUEARRY:

25   Q.  What's the date of the purchase of the hard drive,

1   according to the Amazon receipt, Mr. Harrison?

2   A.  January 26th, 2013.

3   Q.  Did John Harlan -- is that the day that you had that

4   conversation with John Harlan about buying the hard drive?

5   A.  Yes.

6   Q.  What did you tell John Harlan during that conversation?

7           MR. COOPER:  Objection, hearsay.

8           THE COURT:  Overruled.

9   BY MR. QUEARRY:

10  Q.  What did you tell John Harlan about that --

11  A.  That the hard drive --

12  Q.  -- during that conversation?

13  A.  That the hard drive had crashed or was crashing.

14  Q.  Is that all that you told John Harlan during that

15  conversation?

16  A.  And I think I told him that -- or either told him or

17  showed him that I had saw other hard drives that I wanted, and

18  that I needed to replace it.

19  Q.  So you told John Harlan that your gaming computer hard

20  drive was crashing and that -- and you sent him a link?

21  A.  Yeah.  I probably sent him a link to a hard drive that I

22  liked, or just told him what it was.

23  Q.  What kind of a hard drive did you send him a link of?

24  A.  It was a solid state drive.

25  Q.  Were you previously able to afford a solid state drive

1  prior to that date?

2  A.  No.  They had pretty much been too expensive before then.

3  Q.  A solid straight -- I'm sorry.  Solid state drives have

4  gone down in price, is that correct?

5  A.  Yes, and become larger for the price.

6  Q.  Are they better for a gaming computer?

7  A.  Yes.

8  Q.  Did you ask John Harlan to ship the hard drive directly to

9  you?

10  A.  Yes.

11  Q.  Did you ask John Harlan to pay for the new hard drive for

12  you so that you could hide the source of who paid for the hard

13  drive?

14  A.  No.

15  Q.  Did you ask John Harlan to pay for the new hard drive for

16  you for any other reason besides him owing you an amount of

17  money equal to the price of the hard drive?

18  A.  No.

19  Q.  Did you tell John Harlan that your gaming computer hard

20  drive was crashing so that you could destroy a hard drive

21  containing information related to this lawsuit?

22  A.  No.

23  Q.  Okay.  When did you receive the new hard drive?

24  A.  In early February 2013, I believe.

25  Q.  When you received the new hard drive, did you still have

1   the old gaming hard drive?

2   A.  Yes.

3   Q.  And what was the state of the old gaming hard drive when

4   you received the new hard drive in early February of 2013?

5   A.  It had crashed entirely, was no longer functioning.

6   Q.  Were you sure that the old gaming hard drive would never

7   be usable again?

8   A.  Yeah.  It was clicking, which is an indicator that it is

9   entirely dead.

10  Q.  Was there anything on the old gaming hard drive that you

11  wanted to save or recover?

12  A.  No.  It was a gaming computer.  I don't have anything on

13  there, nothing on there that I want to save.  It was just

14  games.

15  Q.  So there was no reason for anyone to examine the old

16  gaming hard drive, is that correct?

17  A.  Correct.

18  Q.  Was there any reason for you to keep that gaming hard

19  drive?

20  A.  No.  It was dead.

21            THE COURT:  Do you want to offer the receipt?

22            MR. QUEARRY:  That point -- that's -- oh, I'm sorry.

23  Did I?  I didn't?

24            THE COURT:  You didn't even mark it.

25            MR. QUEARRY:  Yes, Your Honor.  We move to admit the

1   purchase of the hard drive.

2           THE COURT:  What do you want to call it?

3           MR. QUEARRY:  Defendant's Exhibit 1.

4           THE COURT:  All right.  Is it marked?

5           MR. QUEARRY:  No, Your Honor.

6           MR. NICOLETTI:  Your Honor, can we use letter

7   designations as opposed to --

8           THE COURT:  Sure.  Do you have any stickers?  We'll

9   mark it as Defendant's A.  Is there an objection?

10          MR. COOPER:  No objection, Your Honor.

11          THE COURT:  Admitted.

12                         *(Defendant's Exhibit A was*

13                          *received in evidence.)*

14          THE COURT:  This is something new?

15          MR. QUEARRY:  That's Plaintiff's Exhibit 4.

16          THE COURT:  Okay.

17  BY MR. QUEARRY:

18  Q.  Michael, do you remember when plaintiff's counsel was

19  asking you about your responses to their request for

20  production?

21  A.  Yes.

22  Q.  Did you prepare the objection, general objections, stated

23  at the beginning of those requests?

24  A.  I'm sorry.  I don't understand the question.

25  Q.  Did you prepare -- I'm sorry.  Did you draft the general

1  objection that is stated in bold lettering at the beginning of

2  the responses?

3  A.   No.

4  Q.   Okay.  Did I prepare those as your counsel?

5  A.   Yes.

6  Q.   Okay.  And can you go take a look at response number 3 for

7  me?  And what -- what does -- or request number 3 seek?

8  A.   "All documents referring, relating to or comprising

9  records associated with the purchase of a Computer Device."

10  Q.   And what was your response?

11  A.   "See attached hard drive purchase receipt."

12  Q.   So you weren't trying to hide the purchase of a new

13  computer hard drive from Plaintiff, is that correct?

14  A.   Correct.

15  Q.   They were aware of that -- well, let me -- I'll withdraw

16  that question.

17           Can you take a look at the date that your responses

18  to their request for production were served?

19  A.   I don't know where to find that on here.

20  Q.   It would be on the last page.

21  A.   October 24th, 2013.

22  Q.   What did you do with the old gaming hard drive immediately

23  after you replaced it with the new one?

24  A.   Oh, I put the drive in a scrap pile.

25  Q.   What else was in your scrap pile?

1  A.  Any computers or electronic scrap that I had acquired from

2  the last time that I got rid of some.

3  Q.  And why did you have electronic scrap sitting around?

4  A.  From working on other people's computers or any devices

5  that had failed.

6  Q.  And did you state how long that the old gaming computer

7  hard drive sat in your scrap pile?

8  A.  Probably a couple of weeks.

9  Q.  And that was dating from the purchase of the new hard

10  drive?

11  A.  From the date I received it.

12  Q.  Okay.  When did you take the old gaming hard drive to GGI

13  Recycling?

14  A.  I think I took all of my scrap probably in late

15  February 2013.

16  Q.  That's almost five months after you received the letter

17  from Comcast, is that correct?

18  A.  Correct.

19  Q.  Okay.  Why did you take the old gaming hard drive to GGI?

20  A.  So that it would be recycled.

21  Q.  And did you previously work for GGI?

22  A.  Yes.

23  Q.  How long did you work for GGI?

24  A.  I think about a year and a half.

25  Q.  What did you do for GGI?

1  A.  I was a technician and a sales manager.

2  Q.  Does it help your old employer's business to take

3  electronic scrap there to be recycled?

4  A.  Yes.

5  Q.  Does it also help the environment?

6  A.  Yes.

7  Q.  Do you remember specifically what you did when you took

8  the old gaming hard drive to GGI?

9  A.  I think I took -- I would have taken all my scrap in and

10  sorted it based on where stuff went.  There's a bin for hard

11  drives and a location that had, like, screens for recycling,

12  and a place that had things that needed to be torn apart for

13  circuit boards taken out, and scrap metal.

14  Q.  When was the last time you had taken scrap to GGI prior to

15  late February 2013?

16  A.  Probably a month or two before that.

17  Q.  For what purpose?

18  A.  To go see the people that worked there, that I was still

19  friends with, and to take any scrap that I had.

20  Q.  What about before that?

21  A.  Probably a month or two before that.

22  Q.  Do you remember how many times you had visited GGI prior

23  to taking the old gaming hard drive there in late February of

24  2013?

25  A.  Quite a few since the time that I stopped working there in

1   February.

2   Q.  Mr. Harrison, did you take your old gaming computer hard

3   drive to GGI because you were trying to hide information and

4   you knew the hard drive would be destroyed?

5   A.  No.

6   Q.  Mr. Harrison, were copies of any X-Art movies ever on the

7   old gaming computer hard drive that you destroyed?

8   A.  No.

9   Q.  Was there any data or information on your old gaming hard

10  drive that you wanted to permanently conceal by destroying at

11  GGI Recycling?

12  A.  No.

13  Q.  Did you destroy that hard drive for the purpose of hiding

14  any adverse information whatsoever?

15          MR. COOPER:  Objection, asked and answered.

16          THE COURT:  Overruled.

17  A.  Can you repeat the question?

18  BY MR. QUEARRY:

19  Q.  Yes.  Did you destroy the old gaming hard drive for any

20  bad-faith purpose or to hide any adverse information

21  whatsoever?

22  A.  No.

23  Q.  Do you remember the date the plaintiff served you with a

24  copy of the summons and complaint in this case?

25  A.  Yes.

1  Q.  And what was the date?

2  A.  I honestly don't remember.

3  Q.  Was it after you recycled the hard drive?

4  A.  Yes.

5  Q.  Is that the first time that you saw the summons and

6  complaint in this case?

7  A.  Yes.  I think it was sometime in April, if I can go back

8  to answer that.

9  Q.  Is that the first time you've ever seen your name on a

10  court document of any kind?

11  A.  Yes.

12  Q.  Is that the first time that you became aware that you were

13  a defendant in this lawsuit?

14  A.  Yes.

15  Q.  Is that because the summons said you were a defendant in a

16  lawsuit and that you needed to take action immediately?

17  A.  Yes.

18  Q.  And is that the first time that you became aware that you

19  personally were being sued for copyright infringement?

20  A.  Yes.

21  Q.  How did you feel after you first became aware that you

22  were a defendant being sued for copyright infringement?

23  A.  Nervous and kind of angry.

24  Q.  And have you been nervous and kind of angry throughout

25  this entire lawsuit?

1  A.  Yes.

2  Q.  Okay.  After you received the September 27, 2012, Comcast

3  letter in October of 2012, did you think that litigation

4  against you was imminent?

5  A.  No.

6  Q.  After you received a copy of the summons and complaint in

7  late March or early April of 2013, did you think that

8  litigation against you was imminent?

9  A.  Yes.

10  Q.  What did you do after you were served with a copy of the

11  summons and complaint?

12  A.  I immediately started looking for a lawyer.

13  Q.  Mr. Harrison, have you truthfully disclosed the existence

14  of every computer hard drive and electronic storage device

15  owned by you to the plaintiff relevant to this case?

16  A.  Yes.

17  Q.  Have you produced every computer hard drive and electronic

18  storage device owned by you to the plaintiff relevant to this

19  case?

20  A.  Yes.

21  Q.  Did you commit the six alleged direct infringements in

22  this case?

23  A.  No.

24  Q.  Have you ever used BitTorrent to download a copy of any

25  X-Art movie onto a computer hard drive that you have used or

1  owned?

2  A.  No.

3  Q.  Have you ever used BitTorrent to download a copy of any

4  X-Art movie onto a computer hard drive that was used or owned

5  by someone else?

6  A.  No.

7  Q.  Have you ever used BitTorrent to download or transfer a

8  copy of any X-Art movie onto an electronic storage device that

9  you have used or owned?

10  A.  No.

11  Q.  And, Mr. Harrison, do you -- you do realize that you are

12  under oath, correct?

13  A.  Yes.

14  Q.  Have you ever used BitTorrent to download or transfer a

15  copy of any X-Art movie onto an electronic storage device that

16  was used or owned by someone else?

17  A.  No.

18  Q.  Have you ever used BitTorrent to download or transfer a

19  copy of any X-Art movie onto a gaming console that you have

20  used or owned?

21  A.  No.

22  Q.  Have you ever used BitTorrent to download or transfer a

23  copy of any X-Art --

24          THE REPORTER:  I'm sorry.  Can you slow down just a

25  little bit?

1          MR. QUEARRY:  I'm sorry.  Do I need to go back a

2  little bit?

3          THE REPORTER:  Just start the last question.

4  BY MR. QUEARRY:

5  Q.  Okay.  Have you ever used BitTorrent to download or

6  transfer a copy of any X-Art movie onto a gaming console that

7  was used or owned by someone else?

8  A.  No.

9  Q.  Have you ever used BitTorrent to download or transfer a

10 copy of any X-Art movie onto a computer server that you have

11 used or owned?

12 A.  No.

13 Q.  Have you ever used BitTorrent to download a copy of any

14 X-Art movie onto a computer server that was used or owned by

15 someone else?

16 A.  No.

17 Q.  Have you ever used BitTorrent to upload a copy of any

18 X-Art movie to any other person also using BitTorrent?

19 A.  No.

20 Q.  Have you ever uploaded a copy of any X-Art movie onto a

21 torrent Web site?

22 A.  No.

23 Q.  Have you ever seen or allowed any person to use an IP

24 address assigned to you to download a copy of any X-Art movie

25 onto a drive or device at your residence?

1   A.   No.

2   Q.   Have you ever seen or allowed any person to use an IP

3   address assigned to you to upload a copy of any X-Art movie to

4   any other person connected to the Internet?

5   A.   No.

6   Q.   Mr. Harrison, are you currently employed?

7   A.   Yes.

8   Q.   Where?

9   A.   Caterpillar Reman in Franklin, Indiana.

10  Q.   How long have you been employed there?

11  A.   Almost three and a half years, a little over three years.

12  Q.   What's your job title?

13  A.   Currently I'm a material handler.

14  Q.   Did you have a different job title previously?

15  A.   Yes.  I was also at some point a dunnage operator, a

16  dunnage washer.  And I was also a quality inspector.

17  Q.   Mr. Harrison, what's your current weekly work schedule?

18  A.   At the time?

19  Q.   Right now.

20  A.   Oh, currently, it's Sunday through Thursday, 6:30 p.m. to

21  5:00 a.m.  And then a lot of times I work a Friday, as well,

22  6:30 to 3:00 a.m., 6:30 p.m. to 3:00 a.m.

23  Q.   So you worked third shift?

24  A.   Yes.

25  Q.   Does that mean you sleep during the day?

1  A.  Yes.

2          MR. COOPER:  Objection, relevance.

3          MR. QUEARRY:  Your Honor, I'm attempting to show

4  that it's going to go back to the IP address that Comcast

5  identified as Mr. Harrison's IP address to further establish

6  that he was not home and his computers were not on at the time

7  of the infringement, alleged infringement.

8          THE COURT:  You're asking about his current

9  employment.

10          MR. QUEARRY:  Right.  So I'll get to that.  That's

11  what -- I'm laying a foundation.

12          THE COURT:  All right.  Overruled.

13  BY MR. QUEARRY:

14  Q.  Does that mean you slept during the day?

15  A.  Yes.

16  Q.  Has that always been your weekly and hourly work schedule?

17  A.  No.  It varies.  Sometimes I go in somewhere between 6:30

18  and 8:30 p.m.

19  Q.  Is that to work overtime?

20  A.  Yes.

21  Q.  Do you ever work on Saturdays?

22  A.  No.

23  Q.  Do you work overtime hours?

24  A.  Yes.

25  Q.  On average, how many overtime hours do you work?

1   A.   A lot of times, somewhere between 10 and 18 overtime

2   hours.

3   Q.   What time do you usually go to work?

4   A.   On a regular day that I'm not working overtime, I would

5   have to clock in at work at 8:30 p.m.

6   Q.   Mr. Harrison, what was your -- was your home address the

7   week of July 30th, 2012, to August 4th, 2012, 1044 Ventura

8   Court, Greenwood, Indiana?

9   A.   Yes.

10  Q.   And you worked at Caterpillar Reman during that time?

11  A.   Yes.

12  Q.   Okay.  And how long did it take you to get to work from

13  your home address at that time?

14  A.   I always left about an hour early, so about 7:30 if I

15  wasn't working overtime.  An hour before whenever I had to go

16  in.

17  Q.   What time in the morning would you typically get home

18  after leaving work at 5:00 a.m.?

19  A.   Somewhere between 5:20 and 5:45, depending on traffic and

20  how fast I got out of work.

21  Q.   After you got home from work, did you go to -- would you

22  typically go to bed?

23  A.   At the time, especially for what job I was doing, yeah, I

24  would usually not be awake for very long after I got home.

25  Q.   What time would you typically wake up to go to work?

1  A.  About an hour before I left the house, so two hours before

2  I had to clock in.

3  Q.  Did you ever use your computers when you got home from

4  work?

5  A.  No.  Rarely.

6  Q.  If on one of those rare occasions when you did use your

7  computer when you got home from work, would you turn your

8  computer off before you went to sleep?

9  A.  Yes.

10  Q.  Did you ever use your computers after you woke up?

11  A.  Sometimes.

12  Q.  And did you always turn your computers off before you went

13  to work?

14  A.  Yes.

15  Q.  Did you ever take your computers to work with you?

16  A.  No.

17  Q.  Did you obtain your work hours for the week of July 30th,

18  2012, to August 4th of 2012 from your employer?

19  A.  From the staffing agency that was employing me at the

20  time.

21  Q.  And did you clock in to work at 8:19 p.m. Eastern Standard

22  Time on July 30th, 2012?

23  A.  Yes.

24  Q.  And did you have a 24-minute lunch break from 12:30 a.m.

25  to 12:54 a.m. on July 31st, 2012?

```
 1  A.  Yes.
 2  Q.  And did you finish your work shift from -- at 5:00 a.m. on
 3  July 31st, 2012?
 4  A.  Yes.
 5  Q.  Do you remember what time you went to bed on July 30th,
 6  2012?
 7  A.  It was -- would that have been when I got home from work?
 8  Q.  I believe July 30th, 2012, would have been a Saturday.
 9  A.  What time I went to bed?
10  Q.  I'm sorry.  July 30th, 2012, would have been a Sunday.
11  A.  So what time I would have went -- since I worked third
12  shift, what time I would have went to bed before I woke up to
13  go to work?  I'm sorry.  The question is confusing me.
14  Q.  Right.  That's correct.
15  A.  So what time I would have went to bed?  It would have been
16  early Sunday morning, 6:00 -- or 5:00, 6:00, 7:00ish,
17  somewhere in there, maybe a little bit earlier if it was my
18  day off, technically.
19          THE COURT:  Just so record is clear, July 30, 2012,
20  is a Monday.
21          MR. QUEARRY:  July 30th, 2012?
22          THE COURT:  July 30, 2012, is a Monday.
23          MR. QUEARRY:  Okay.
24          THE COURT:  I will take judicial notice of the
25  calendar.
```

1             MR. QUEARRY:  Okay.

2    BY MR. QUEARRY:

3    Q.  But just to be clear, you would have went to work Sunday

4    night into Monday morning, is that correct?

5    A.  Yes.

6    Q.  Do you remember what time you left for work on July 30th,

7    2000 -- or, I'm sorry.  Do you remember what time you left

8    work on July 30th, 2012?

9    A.  Was that Monday morning?

10   Q.  Correct.

11   A.  Okay.  So Monday morning, then I would have left work at

12   5:00 a.m.

13   Q.  Did you use any of your computers when you got home from

14   work on July 30th, 2012?

15   A.  I don't believe so.

16   Q.  Have you ever downloaded the movie In Time?

17   A.  No.

18            MR. QUEARRY:  Your Honor, I have no further

19   questions at this time.

20            THE COURT:  All right.  Redirect?

21            MR. LIPSCOMB:  Your Honor, can we have two minutes?

22            THE COURT:  Yes.

23            MR. LIPSCOMB:  Thank you.

24            (Off the record.)

25            MR. COOPER:  Sorry for the delay, Your Honor.

1      THE COURT:  That's all right.

2                **REDIRECT EXAMINATION**

3   BY MR. COOPER:

4   Q.  Mr. Harrison, at the time you received the notice from

5   Comcast in October of 2012, you didn't go and look at the

6   court docket in this case, did you?

7   A.  No.

8   Q.  And you didn't know that there was a court order that

9   required Malibu to serve the Doe defendants in this case after

10  receiving their identifying information, did you?

11  A.  No.

12  Q.  And you didn't at that time reach out to Malibu Media?

13  A.  No.

14  Q.  Nor did you reach out to Comcast?

15  A.  No.

16  Q.  Nor did you seek counsel at that time?

17  A.  Nothing other than just looking it up on the Internet.

18  Q.  And you didn't call the court either?

19  A.  No.

20  Q.  Mr. Harrison, for BitTorrent to be running and uploading a

21  program, you don't actually have to be sitting at your

22  computer, do you?

23  A.  No.

24  Q.  So you can have the BitTorrent client on and running and

25  not be in front of it, correct?

*PAIGE - DIRECT/COOPER*                    71

1   A.   Correct.

2          MR. COOPER:  May I have just one more second, Your

3   Honor?

4          THE COURT:  Sure.

5          MR. COOPER:  Thank you.

6          No further questions.  Thank you.

7          THE COURT:  Any recross?

8          MR. QUEARRY:  No, Your Honor.

9          THE COURT:  All right.  Thank you, Mr. Harrison.

10  You may step down.

11         (Witness excused.)

12         THE COURT:  Call your next witness.

13         MR. COOPER:  Your Honor, the plaintiff calls to the

14  stand Patrick Paige.

15         THE WITNESS:  Good morning, Your Honor.

16         THE COURT:  Good morning.  Would you raise your

17  right hand?

18         (The witness is sworn.)

19         THE COURT:  Please be seated.

20         **PATRICK PAIGE, PLAINTIFF'S WITNESS, SWORN**

21                   <u>**DIRECT EXAMINATION**</u>

22  BY MR. COOPER:

23  Q.   Mr. Paige, please state your name for the record.

24  A.   Patrick Paige.

25  Q.   Mr. Paige, can you please describe for the Court your work

*PAIGE - DIRECT/COOPER*                    72

1  history?

2  A.  Over 25 years in law enforcement and over ten years in the

3  Computer Crimes Unit.

4  Q.  What kind of cases did you work on for the Computer Crimes

5  Unit?

6  A.  Just about any type of case that came across the desk.

7  Everything from homicides to child pornography investigations

8  to suicide investigations, anything that involved the computer

9  while I was in the Computer Crimes Unit.

10  Q.  And you've conducted computer forensic examinations for

11  various sectors of law enforcement, is that correct?

12  A.  Yeah.  I investigated computer -- did computer forensics

13  for various law enforcement agencies within Palm Beach County,

14  as well as local and federal agencies, like the FBI, U.S.

15  Customs, Secret Service.

16  Q.  And you've supervised other detectives conducting similar

17  investigations, correct?

18  A.  Yes.

19  Q.  And, Mr. Paige, you're familiar with software programs

20  that are used to investigate computers, right?

21  A.  Yes.

22  Q.  And you've used EnCase and AccessData?

23  A.  Yes, among many.

24  Q.  Have you ever taken any courses designed to teach people

25  how to investigate computers?

1  A.  Yes.

2  Q.  About how many hours of course work have you done?

3  A.  Hundreds.  I don't know off the top of my head.

4  Q.  And, Mr. Paige, you received commendations, is that

5  correct?

6  A.  Yes.

7  Q.  In 1999 -- I'm sorry.  In 1991, were you deputy of the

8  year?

9  A.  Yes.

10  Q.  In 1997, were you deputy of the month for June?

11  A.  Yes.

12  Q.  In 2002, were you outstanding law enforcement officer of

13  the year?

14  A.  Yes, by the Department of Justice.

15  Q.  And, Mr. Paige, you've testified as an expert in various

16  courts before, correct?

17  A.  Yes.

18  Q.  At both the state and federal level?

19  A.  And military, yes.

20  Q.  Has any court ever refused to accept your testimony as an

21  expert in computer forensics?

22  A.  No.

23  Q.  Mr. Paige, let's talk briefly about your experience

24  investigating child pornography cases.

25  A.  Okay.

*PAIGE - DIRECT/COOPER*                     74

1  Q.   In those situations, did you supervise police officers

2  whose responsibility it was to establish a successful TCP/IP

3  connection with people who were sending child pornography over

4  the Internet?

5  A.   Yes.

6  Q.   And did you record those offenders' IP addresses?

7  A.   Yes.

8  Q.   And you also recorded the dates and times of the illegal

9  transmissions, is that correct?

10 A.   Yes.

11 Q.   After that, you would then request that the state

12 attorney's office issue a subpoena, is that right?

13 A.   Yes.

14 Q.   And that subpoena would be served on the Internet service

15 provider, right?

16 A.   Yes.

17 Q.   And in those cases, the Internet subscribers were not sent

18 notices notifying them of the subpoena, were they?

19 A.   No, they weren't.

20 Q.   And what's the reason for that?

21 A.   Because of the -- the issue of destruction of evidence

22 would occur, most likely.

23 Q.   After you received the subscriber's identity from the

24 Internet service provider, then you would get a search

25 warrant, is that correct?

1   A.   Yes.   That would be one of the processes that we would do.

2   Q.   And when you executed that search warrant, you were then

3   entitled to seize the computers for the offenders who were

4   distributing on-line child pornography, is that right?

5   A.   Yes.

6   Q.   And how many search warrants were you involved with either

7   directly or by way of managing the process?

8   A.   A few hundred.

9   Q.   Would you say over 100?

10  A.   It's somewhere around the number of about 200.

11  Q.   In all those times, those 200 times that you executed

12  search warrants, was there ever an instance in which you did

13  not find the child pornography or evidence of the other crimes

14  that you were looking for?

15  A.   I was involved in one incident where that didn't happen.

16  Q.   And what were the circumstances surrounding that incident?

17  A.   That was an individual in Boca Raton, Florida, that had an

18  open Wi-Fi network.

19  Q.   And where was the actual offender in that case?

20  A.   He was located adjacent to the residence behind the known

21  sex offender.

22  Q.   Mr. Paige, in any of those 200 cases, did you ever

23  encounter a case of Wi-Fi hacking?

24  A.   I haven't.

25  Q.   I would like to talk now briefly about your test of IPP's

*PAIGE - DIRECT/COOPER*                76

1    software that you conducted for Malibu Media.

2            MR. QUEARRY:  Objection, Your Honor.  I would like

3    to proceed with some preliminary questions subject to an

4    objection.

5            THE COURT:  Basis?

6            MR. QUEARRY:  Mr. Paige is not qualified as a

7    BitTorrent expert.  The defendant recently took his

8    deposition, and it became clear that he's not qualified in the

9    area of BitTorrent, packet capturing, or packet capture

10   analysis.

11           THE COURT:  Mr. Cooper?

12           MR. COOPER:  Your Honor, the witness has extensive

13   experience in BitTorrent.  He conducted a test of IPP's

14   software.  IPP in this case is Plaintiff's investigator who

15   detected the infringement.  And IPP has a contract with Malibu

16   Media, for which they provide those services.

17           Mr. Paige and his partner conducted a test of that

18   software to ensure that it worked.  And Mr. Paige is

19   qualified, he's experienced with BitTorrent, he knows

20   BitTorrent.  He's used BitTorrent in law enforcement in

21   capturing child pornographers and the like, and he's qualified

22   to testify about that matter.

23           THE COURT:  I'm going to allow the questions.

24   During cross-examination, you can establish your foundation.

25   And at that point, if you move to exclude any portion of

1  Mr. Paige's testimony, I'll take it under advisement and

2  consider it at the time of my ruling.

3           MR. QUEARRY:  Thank you, Your Honor.

4  BY MR. COOPER:

5  Q.  Mr. Paige, did you test IPP's system for detecting on-line

6  infringers?

7  A.  Yes, I did.

8  Q.  Can you briefly describe that test for the Court, please?

9  A.  Well, essentially, we want to put it to a real-life test,

10 so we started off with a game plan to take four movies,

11 download it from a public domain, which were not copyrighted,

12 protected.  And one of the first steps we decided to do was to

13 encode them with a specific encoding across the screen,

14 numbers and letters, to have a unique identification to each

15 of the videos.

16 Q.  Okay.  So you downloaded public domain movies, not

17 copyrighted movies, correct?

18 A.  That's correct.

19 Q.  And then you can explain the next step?  Did you set up

20 servers in this case?

21 A.  Yes.  We also rented four independent servers with unique

22 static IP addresses.

23 Q.  And did you install an operating system on those servers?

24 A.  Yes.  They come with an operating system when we rented

25 them, Windows operating system.

1   Q.  Did you subsequently install BitTorrent on those servers?

2   A.  Yes.

3   Q.  And what did you do with the encoded movies that you had

4   received from the public domain?

5   A.  Once we set up the servers, we installed the BitTorrent

6   client software.  We created -- we uploaded the movies that we

7   created to the servers.  Once they were on the servers, we

8   created torrent files of those each four videos.

9   Q.  Was Wireshark installed on those servers?

10  A.  Yes, it was.

11  Q.  And can you explain what Wireshark is?

12  A.  It's a -- basically, it's a program that captures data in

13  and out of a particular computer, in the form of packets.  The

14  data packets that come into a computer are captured.

15  Q.  And a data packet is commonly referred to as a pcap,

16  correct?

17  A.  Yes.  It produces pcap files.

18  Q.  Is a pcap akin to a video recording?

19  A.  Essentially it records data traffic in and out of a box.

20  Q.  So a pcap would record incoming and outgoing traffic?

21  A.  Yes.

22  Q.  After you installed Wireshark and BitTorrent, and you

23  seated -- I'm sorry.  You seated the public domain movies on

24  BitTorrent, correct?

25  A.  Yes.

1  Q.  Can you describe what happened next?

2  A.  Essentially we were -- we gave the names of the files that

3  we created to IPP Limited and advised them to start their

4  tests.  And they began the process of searching out those

5  specific files.

6  Q.  Were they able to find those files?

7  A.  Yes.  Within 24 hours, they essentially notified us that

8  they had located --

9           MR. QUEARRY:  Objection, hearsay.

10          MR. COOPER:  I'm sorry.  He's testifying to the

11  results of the examination.

12          MR. QUEARRY:  Anything said by IPP is -- falls under

13  the definition of hearsay, Your Honor.

14          MR. COOPER:  I'm sorry.  He's not testifying as to

15  what IPP told him.  He's testifying to the results of the

16  examination that he found after the test was conducted.

17          THE COURT:  I think he was exactly testifying as to

18  it.  You asked him, "What results did IPP give you?"  That's

19  what IPP told him, is it not?

20          MR. COOPER:  I'll move on, Your Honor.

21          THE COURT:  All right.  Sustained.

22  BY MR. COOPER:

23  Q.  Mr. Paige, what was the conclusion that you were able to

24  derive from the results of your test?

25          MR. QUEARRY:  Objection, foundation.

1      THE COURT:  Overruled.

2   A.  That it worked.

3   BY MR. COOPER:

4   Q.  And what was your -- what is your conclusion based upon?

5   A.  The fact that I received screen captures indicating that

6   they captured each one of the four movies that I had uploaded

7   and coded, and that the pcap files were examined to show that

8   there was TCP connection between our servers and servers run

9   by IPP Limited.

10  Q.  And you had pcaps that -- from the servers that you had

11  installed, right?

12  A.  Yes.

13  Q.  And you examined those pcaps, correct?

14  A.  Yes.

15  Q.  And those pcaps -- and when you did so, you were able to

16  determine that IPP had accurately detected the IP address, is

17  that correct?

18  A.  Yes.

19  Q.  Mr. Paige, let's talk now about the examination of the

20  hard drive that you did in this case.  Did you examine the

21  defendant's computer hard drives in this case?

22  A.  Yes.

23  Q.  Which hard drives did you examine?

24  A.  I examined the hard drive that contained -- I believe it

25  was a Western Digital hard drive that contained two

1  partitions, each partition containing a separate operating

2  system.

3  Q.  And there were two images on that hard drive, right?

4  A.  There was two partitions containing two operating systems.

5  Q.  And each of those partitions related to one of the

6  defendant's computer devices, is that right?

7  A.  Yes.

8  Q.  And do you know which two computer devices those were?

9  A.  I believe that one is being referred to as the Acer laptop

10 computer, and another as being referred to as the Sammy PC.

11 Q.  When you examined the Sammy PC, were you able to determine

12 when the hard drive -- I'm sorry, when the operating system

13 was installed?

14 A.  Yes.

15 Q.  And when was that operating system installed?

16 A.  I don't have the date in front of me.  I would need to

17 refresh my memory by reviewing my summary.

18         MR. QUEARRY:  Your Honor, I would object to the

19 witness testifying based on his expert report.

20         THE COURT:  Why?

21         MR. QUEARRY:  He should be familiar with the case to

22 be able to testify as to his examination without referring

23 to --

24         THE COURT:  Overruled.

25         Sammy is S-A-M-M-Y?

1         THE WITNESS:  Yes, S-A-M-M-Y.

2    BY MR. COOPER:

3    Q.  Mr. Paige, can you please review that?  Please hand it

4    back to me when you're done.

5    A.  The install date was 2/6, 2013.

6    Q.  Mr. Paige, when you examined the version of Windows 7

7    that was installed on the Sammy hard drive, what were your

8    conclusions about that version of the operating system?

9    A.  As far as the product ID code?

10   Q.  Yes.

11   A.  Yes.  I conducted a search of the Internet for that

12   specific IP code, and found it listed on numerous pirated Web

13   sites, hacker Web sites.

14   Q.  Mr. Paige, what did your examination of the Acer laptop

15   image reveal?

16   A.  That there was a torrent, uTorrent installed on the

17   machine, as well as remnants of Web history involving torrent

18   activity.

19   Q.  Mr. Paige, do you recall when the BitTorrent client was

20   installed on that machine?

21   A.  I can't recall, off the top of my head, the exact date and

22   time.

23   Q.  Please examine this and just hand it back to me when

24   you're done.

25   A.  On December 13, 2010.

1   Q.  Mr. Paige, if a hard drive crashes, is it possible to

2   recover data from that drive?

3   A.  Yes.

4   Q.  Have you ever recovered data from a crashed hard drive?

5   A.  Yes.

6   Q.  Mr. Paige, did you examine a copy of the hard drive that

7   the defendant claims crashed in this case?

8   A.  No.

9   Q.  Mr. Paige, if Plaintiff's allegations were true and the

10  defendant used BitTorrent on his gaming computer hard drive

11  before it crashed to download Plaintiff's copyrighted movies,

12  copies of those movies would have been found on the drive,

13  right?

14          MR. QUEARRY:  Objection, speculation.

15          MR. COOPER:  I'm presenting a hypothetical.

16          THE COURT:  I'll allow it.  Overruled.

17  A.  Can you repeat the question again?

18  BY MR. COOPER:

19  Q.  If the plaintiff's allegations are true and the defendant

20  used BitTorrent on the gaming computer hard drive, before it

21  crashed, to download Plaintiff's copyrighted movies, copies of

22  those movies would have been found on that hard drive, is that

23  right?

24  A.  Yes.

25          MR. COOPER:  May I have a moment, Your Honor?

*PAIGE - DIRECT/COOPER*                      84

1            (Off the record.)

2   BY MR. COOPER:

3   Q.  Mr. Paige, when you conducted a test of IPP's software in

4   that case, IPP had also installed a program similar to

5   Wireshark on their servers, is that correct?

6   A.  Yes.

7   Q.  And that program is called --

8            MR. QUEARRY:  Objection, lack of foundation -- or,

9   I'm sorry.  Lack of personal knowledge.

10           THE COURT:  Could you read the question back?

11           (The record was read.)

12           THE COURT:  I'll overrule it.  It asks what he

13  knows, so I'll allow it.  Overruled.

14  BY MR. COOPER:

15  Q.  So, Mr. Paige, IPP had also installed a program similar to

16  Wireshark on their servers, right?

17  A.  Yes.  I believe it was tcpdump.

18  Q.  And tcpdump is functionally equivalent to Wireshark, is

19  that correct?

20  A.  It monitors network traffic, yes, and creates pcap files.

21  Q.  Did you review the pcaps from IPP?

22  A.  Yes.

23  Q.  And when you reviewed the pcaps -- when you -- did you

24  compare the pcaps from IPP against the pcaps that you had

25  captured using Wireshark?

*PAIGE - CROSS/QUEARRY*                    85

1   A.   Yes.

2   Q.   Were the pcaps similar?

3   A.   Yes.   They were similar dates and times, and the IP

4   addresses of our servers matched their servers.

5   Q.   Would that have happened if IPP software was not correct?

6           MR. QUEARRY:   Objection, speculation.

7           THE COURT:   I'll allow it.

8   A.   No.

9           MR. COOPER:   I'm sorry, Your Honor, just one more

10  moment.

11          (Off the record.)

12  BY MR. COOPER:

13  Q.   Mr. Paige, at the time you conducted the examination of

14  the defendant's Sammy computer hard drive, were you aware that

15  there was a hard drive that had been used prior to that?

16  A.   No.

17  Q.   If you had been aware, would that have been an important

18  piece of evidence for you to inspect in this case?

19  A.   Absolutely.

20          MR. COOPER:   Nothing further, Your Honor.

21          THE COURT:   Mr. Quearry?

22                    **CROSS EXAMINATION**

23  BY MR. QUEARRY:

24  Q.   Hello, Mr. Paige.   How are you doing?

25  A.   Good morning.

1   Q.   Good morning.   Mr. Paige, did you state anywhere in your

2   report any conclusions about the fact that the hard drive on

3   the Sammy computer was installed in February of 2013?

4   A.   Yes.

5   Q.   And what were those conclusions?

6   A.   In reference to?

7   Q.   This case.

8   A.   What was your original question, please?

9   Q.   I'm sorry.   I'm sorry.   It actually kind of slipped my

10  mind.   Can we have the question repeated back, please?

11            (The record was read.)

12  A.   Yes.

13  BY MR. QUEARRY:

14  Q.   And what were those conclusions?

15  A.   I made notations of the install date.

16  Q.   Mr. Paige, were you aware of the dates of the alleged

17  infringements in this case at the time you conducted your

18  examination?

19  A.   I don't recall.

20  Q.   Do you think that's important as a computer forensic

21  examiner in copyright infringement cases?

22  A.   When I examine a computer, I look for any and all

23  BitTorrent activity regardless of the date and time.

24  Q.   Mr. Paige, was there a BitTorrent client installed on the

25  Sammy hard drive?

1  A.  No.

2  Q.  Do you have any evidence, based on your computer forensic

3  examination of the defendant's hard drives in this case, or

4  through other information, that the defendant intentionally

5  destroyed his hard drive, which could have contained adverse

6  information?

7  A.  No.

8  Q.  Mr. Paige, is the extent of your knowledge about

9  BitTorrent and packet captures of BitTorrent that it is

10  capable of -- the Wireshark program is capable of identifying

11  an IP address?

12  A.  Wireshark is a program that monitors network traffic in

13  and out of a computer in the form of packets, and takes those

14  packets and loads them into the operating system.  And then

15  you can create pcap files and essentially log files of the

16  information in and out of a particular computer.

17  Q.  Do you know how to analyze pcap files?

18  A.  I'm aware that they contain dates and times of TCP/IP

19  connection handshakes between specific computers, IP

20  addresses.  I'm aware of specific areas.  I'm not familiar

21  with any and all -- with every particular field within a

22  Wireshark or within a pcap file, because there's hundreds,

23  literally.

24  Q.  Mr. Paige, did you -- for your test of IPP software, did

25  you set up the Wireshark program to record the pcaps?

1  A.  We used WinDump --

2  Q.  Did you --

3  A.  -- along with Wireshark.

4  Q.  Did you set up WinDump and Wireshark personally?

5  A.  I installed the software.  It may have been -- I'm not

6  sure exactly if it was my partner that actually configured the

7  software or as far as the commands that were prompted in

8  there.

9  Q.  Did you enter any of the commands into Wireshark prior to

10 capturing the packets in the IPP software test?

11 A.  I don't recall offhand.

12 Q.  Do you know if that is an important part of capturing

13 packets through Wireshark?

14 A.  Yes.  Capturing the packet is important to capture dates

15 and times and IP addresses of network traffic.

16 Q.  Well, Mr. Paige, the question was actually, does Wireshark

17 have to be configured a certain way to properly capture

18 packets?

19 A.  Yes.

20 Q.  And do you know how that has to be set up?

21 A.  I know that you need to configure it to a specific network

22 address, making sure that you're capturing the packets on a

23 specific card itself.  If you have multiple cards in there or

24 if you have Wi-Fi in there, you need to make sure that the --

25 that you're capturing the packets on the actual wire, so to

1  speak, that's in and out of a box that's connected to what

2  you're trying to achieve.

3  Q.  And how did you do that in this case?

4  A.  By using the software, you can click on -- I mean, if we

5  can maybe -- if you want to load up Wireshark, we can --

6  Q.  Do you remember specifically how you set up the

7  Wireshark --

8  A.  I don't remember specifically.  I did the tests a couple

9  of years ago.

10          THE COURT:  One of you at a time.

11  A.  I don't remember specifically, no.

12  BY MR. QUEARRY:

13  Q.  Mr. Paige, do you know what a bit field is?

14  A.  In relation to what?

15  Q.  Packet capture analysis.

16  A.  No.

17  Q.  Do you know what an extended BitTorrent message is in

18  packet capture analysis?

19  A.  I believe that is the entire BitTorrent data packet.

20  Q.  Do you believe that or do you know that?

21  A.  I believe that's what it is.

22  Q.  Do you know what a truncated BitTorrent message is?

23  A.  Yes.

24  Q.  Mr. Paige, do you recall at your deposition on

25  December 10th of 2014 when I asked you if you knew what a

1  truncated BitTorrent message was?

2  A.  Yes.

3  Q.  And what was your response?

4  A.  I didn't recall.

5  Q.  Do you remember when I asked you -- I'm sorry, Mr. Paige.

6  Do you know what an extended piece message is?

7  A.  No.

8  Q.  Mr. Paige, do you remember signing an expert declaration

9  in this case, dated November 11th, 2013?

10  A.  Yes.

11  Q.  Do you remember when you stated, "I reviewed IPP's pcaps

12  vis-a-vis the pcap log files created by each of my test

13  servers and determined that IPP's pcaps matched my pcaps"?

14  A.  Yes.

15  Q.  And was that the basis from which you concluded that IPP

16  software worked?

17  A.  That, along with the fact that they had screen captures of

18  the videos that I had uploaded, or that I had shared out via

19  the BitTorrent client.

20  Q.  And when you say that you've, "reviewed IPP's pcaps

21  vis-a-vis the pcap log files created by each of my test

22  servers and determined that IPP's pcaps matched my pcaps," how

23  were you able to do that if you're not able to interpret

24  packet captures?

25  A.  The packets capture the IP address, dates, and times, and

1  the fact that it's BitTorrent traffic in and out of a specific

2  box.  I don't think that that's very hard to do to establish

3  an IP address from a server, my server, to their server.  I

4  mean, you know, in this entire discussion, we're talking about

5  IP addresses, identifying a specific person's identity.

6          In my line of work, only one person can have an IP

7  address at any one time given on the Internet.  So when I

8  examine a packet and I see my IP address connecting to their

9  server, and BitTorrent traffic transferring back and forth, as

10 well as the BitTorrent traffic or the pcap files logging the

11 dates and times that they're capturing on the same end, and

12 matching those two, I don't think it's that hard to figure out

13 that the TCP/IP connection between the two systems was made.

14 Q.  Do pcaps, individual pcap files, contain important data

15 about how much of a movie was transferred through the

16 BitTorrent protocol?

17 A.  It can capture, yeah, the amount of data that is contained

18 within the packet of a specific movie, yes.

19         MR. QUEARRY:  I have no further questions, Your

20 Honor.

21         THE COURT:  All right.  Thank you very much.

22 Mr. Cooper, redirect?

23         MR. COOPER:  Nothing further, Your Honor.

24         THE COURT:  All right.  Thank you very much,

25 Mr. Paige.

 1            THE WITNESS:  Thank you, Your Honor.

 2            (Witness excused.)

 3            MR. COOPER:  Your Honor, at this point I would like

 4    to call Colin Padgett through his deposition testimony.  Colin

 5    Padgett is Comcast Corporation's 30(b)(6) corporate

 6    representative.  If it's okay with you, I would like to have

 7    Mr. Nicoletti play the part of the witness.

 8            THE COURT:  Can't you just submit the deposition and

 9    I'll read it?

10            MR. COOPER:  I can, Your Honor.

11            THE COURT:  As much as I would love to hear

12    Mr. Nicoletti.

13            MR. NICOLETTI:  Judge, I want to say something.

14            THE COURT:  Any objection?

15            MR. QUEARRY:  No, Your Honor.

16            THE COURT:  All right.  Then I'll accept the

17    testimony of Mr. Padgett --

18            MR. NICOLETTI:  Your Honor, that --

19            THE COURT:  -- through his November 5, 2014, Rule

20    30(b)(6) deposition.  Yes, sir, Mr. Nicoletti?

21            MR. NICOLETTI:  Your Honor, I just want to mention

22    that that deposition transcript is designated as confidential,

23    so we would like it to remain out of the public record, if

24    possible.

25            THE COURT:  Very good.

1          MR. COOPER:  Your Honor, at this point, the

2    plaintiff would like to call Jason Bosaw to the stand.

3          THE COURT:  Please raise your right hand.

4          (The witness is sworn.)

5          THE COURT:  Please be seated.

6          **JASON EDWIN BOSAW, PLAINTIFF'S WITNESS, SWORN**

7                    **DIRECT EXAMINATION**

8    BY MR. COOPER:

9    Q.   Mr. Bosaw, please state your full name for the record.

10   A.   Jason Edwin Bosaw.

11   Q.   You were hired as the defendant's expert in this lawsuit,

12   is that correct?

13   A.   Correct.

14   Q.   Mr. Bosaw, you did not examine the hard drive that the

15   defendant claims crashed before he discarded it, did you?

16   A.   No.

17   Q.   And you don't know for sure whether or not that hard drive

18   actually crashed?

19   A.   I don't know anything about that hard drive.

20   Q.   So you have no idea what data or files were contained on

21   that hard drive?

22   A.   No.

23   Q.   And you don't know whether or not Malibu Media's movies

24   were ever on that hard drive?

25   A.   I don't know anything about that hard drive.

1    Q.  And you've never spoken directly with the defendant about

2    this lawsuit, have you?

3    A.  That's correct.

4    Q.  And you have no personal knowledge about the circumstances

5    surrounding the destruction of the hard drive, do you?

6    A.  That's correct.

7              MR. COOPER:  Mr. Bosaw, nothing further.  Thank you.

8              THE COURT:  Mr. Quearry?

9              MR. QUEARRY:  Your Honor, I have no questions for

10   Mr. Bosaw at this time.

11             THE COURT:  All right.  Very good.  You may step

12   down.

13             (Witness excused.)

14             MR. COOPER:  Your Honor, the plaintiff calls Eric

15   Goldsmith to the stand.

16             MR. LIPSCOMB:  Mr. Goldsmith is in the restroom.

17             MR. COOPER:  Oh, okay.  Your Honor, the plaintiff

18   calls Rhonda Arnold to the stand.

19             THE COURT:  Raise your right hand.

20             (The witness is sworn.)

21             THE COURT:  Please be seated.

22             **RHONDA ARNOLD, PLAINTIFF'S WITNESS, SWORN**

23                     **DIRECT EXAMINATION**

24   BY MR. COOPER:

25   Q.  Ms. Arnold, please state your name for the record.

1  A.   Rhonda Arnold.

2  Q.   Ms. Arnold, you did not examine the hard drive that

3  supposedly crashed before Mr. Harrison discarded it, did you?

4  A.   I did not.

5  Q.   You don't know what caused it to crash, do you?

6  A.   I cannot say specifically, no.

7  Q.   You don't know if it even crashed at all, is that correct?

8  A.   That is correct.

9  Q.   And you have no idea what data or files were contained on

10  that hard drive, do you?

11  A.   I do not.

12  Q.   And you don't know whether or not Malibu Media's movies

13  were on that hard drive?

14  A.   I do not.

15  Q.   And you've never spoken directly with the defendant about

16  this lawsuit?

17  A.   I have not -- well, he -- no.  I take that -- he called to

18  tell me that an attorney would probably be calling me, so that

19  I would answer the phone.

20  Q.   And you have no personal knowledge surrounding the

21  facts -- I'm sorry, about the facts surrounding the

22  destruction of the hard drive, correct?

23  A.   I'm sorry.  Say that again.

24  Q.   You have no personal knowledge of the facts surrounding

25  the destruction of the hard drive, correct?

1  A.  Correct.

2  Q.  You didn't see the defendant discard that hard drive, did

3  you?

4  A.  He did bring in items to be recycled, but I cannot say if

5  that particular hard drive in question was in that mix of --

6  Q.  You didn't see him place a hard drive into the hard drive

7  recycling bin at GGI?

8  A.  Not specifically, no.

9           MR. COOPER:  Nothing further.

10           THE COURT:  Mr. Quearry?

11           MR. QUEARRY:  Your Honor, is Plaintiff's motion in

12  limine now somewhat moot --

13           MR. LIPSCOMB:  No.

14           MR. QUEARRY:  -- due to the fact that they are

15  calling witnesses for testimony?  Your Honor --

16           THE COURT:  Do you have any questions?

17           MR. QUEARRY:  Your Honor, I have no questions for

18  Ms. Arnold.  Thank you.

19           THE COURT:  You may step down.  Thank you.

20           (Witness excused.)

21           THE COURT:  Is that your other witness?

22           MR. LIPSCOMB:  Probably.

23           MR. COOPER:  Yes, Your Honor.  I call John Harlan to

24  the stand.

25           THE COURT:  Please raise your right hand.

1      (The witness is sworn.)

2      THE COURT:  Please be seated.

3      **JOHN DAMON HARLAN, PLAINTIFF'S WITNESS, SWORN**

4           **DIRECT EXAMINATION**

5  BY MR. COOPER:

6  Q.  Mr. Harlan, please state your name for the record.

7  A.  John Damon Harlan.

8  Q.  Mr. Hardin -- Harlan, sorry.  You did not examine the hard

9  drive that supposedly crashed before Mr. Harrison discarded

10 it, did you?

11 A.  No.

12 Q.  You don't know what caused that hard drive to crash, do

13 you?

14 A.  I have reasonable beliefs, but no specific knowledge, no.

15 Q.  You don't know if that hard drive even crashed at all, is

16 that correct?

17 A.  That is correct.

18 Q.  You have no idea what data or files were contained on that

19 hard drive?

20 A.  No.

21 Q.  You don't know whether or not Malibu Media's movies were

22 on that hard drive, right?

23 A.  Correct.

24 Q.  And you have no personal knowledge of the facts and

25 circumstances surrounding the destruction of that hard drive,

1    right?

2    A.   Correct.

3              MR. COOPER:  Nothing further.

4              THE COURT:  Mr. Quearry?

5                     **CROSS EXAMINATION**

6    BY MR. QUEARRY:

7    Q.   Mr. Harlan, how are you today?

8    A.   I'll make it.

9              MR. LIPSCOMB:  I'm right there with you.

10   BY MR. QUEARRY:

11   Q.   Mr. Harlan, did you purchase the hard drive on January --

12   a new hard drive for the defendant on January 26, 2013?

13   A.   If that's the date stated on the receipt, the answer is

14   yes.

15   Q.   And did you purchase that new hard drive for the defendant

16   because you owed him money?

17   A.   Yes.

18   Q.   What did you owe the defendant money for?

19   A.   A replacement clutch for my 1994 Toyota Celica.

20   Q.   Did the defendant ask you to buy that hard drive for him

21   to, in some way, conceal or hide the purchaser of that hard

22   drive?

23   A.   No.

24   Q.   Have you ever gamed with the defendant?

25   A.   Yes.

1  Q.  Are you a serious gamer?

2  A.  I'd say no.

3  Q.  Is there a dispute among you and the defendant about

4  whether or not you are?

5  A.  No.  I game, but the amount I game varies frequently.  So

6  there are periods where I would fit the description of

7  hardcore gamer, and there are periods where the answer is no.

8  Q.  Have you ever gamed with the defendant?

9  A.  Yes.

10  Q.  Have you ever seen the defendant using his gaming

11  computer?

12  A.  Yes.

13  Q.  Have you ever seen the defendant using his gaming computer

14  for gaming purposes?

15  A.  Yes.

16          MR. QUEARRY:  Your Honor, I have no further

17  questions.

18          THE COURT:  Very well.  Mr. Cooper, any redirect?

19          MR. COOPER:  No redirect, Your Honor.

20          THE COURT:  All right.  Thank you very much,

21  Mr. Harlan.  You may step down.

22          (Witness excused.)

23          MR. COOPER:  Mr. Quearry, do you intend to call

24  Mr. Goldsmith as a witness?

25          MR. QUEARRY:  I don't -- I'm not going to call

1  Mr. Goldsmith as a witness, Your Honor.  I don't think it's

2  necessary.

3          MR. COOPER:  Neither do we, Your Honor.  We're not

4  going to call him.  We rest our case.  Thank you.

5          THE COURT:  Are you going to present any other

6  witnesses, Mr. Quearry?

7          MR. QUEARRY:  No, Your Honor.  The defendant would

8  move for the entry of an order based on the evidence that

9  Plaintiff has failed to meet its burden on its motion.

10          THE COURT:  Do you want to make any further

11  argument?

12          MR. LIPSCOMB:  Can we make a closing?

13          THE COURT:  Yes.  He's making you do it all today,

14  Mr. Cooper.

15          MR. COOPER:  He sure is.

16          THE COURT:  Make sure he carries --

17          MR. LIPSCOMB:  This is the first time in, like,

18  seven years I haven't had to do this, but he's doing great.

19          THE COURT:  Make sure he carries your bag when you

20  go back.

21          MR. COOPER:  Your Honor, the evidence today has

22  shown that Mr. -- I'm sorry, that the defendant has destroyed

23  relevant evidence.  At the time he did so, he had a notice

24  from Comcast informing him that he had been implicated and in

25  fact identified as a defendant in this lawsuit through his IP

1   address.

2          Seventh Circuit standard says that a defendant has a

3   duty to preserve evidence when he knew or should have known

4   that litigation was imminent.  In this case, litigation had

5   actually already commenced and the defendant was notified of

6   it.

7          The defendant breached his duty to preserve evidence

8   by destroying a hard drive which lied at the heart of this

9   litigation.  And for these reasons, Your Honor, Plaintiff

10  would respectfully request that you enter an appropriate order

11  sanctioning the defendant for the destruction of that

12  evidence.  Thank you.

13          THE COURT:  Thank you, Mr. Cooper.

14          Any further argument, Mr. Quearry?

15          MR. QUEARRY:  Just briefly, Your Honor.

16          THE COURT:  Please.

17          MR. QUEARRY:  Your Honor, as explained in the

18  defendant's response to Plaintiff's motion for sanctions

19  against the defendant for the material destruction -- or, I'm

20  sorry, for the intentional destruction of material evidence,

21  the duty -- I'm sorry.  The standard in the Seventh Circuit is

22  a duty to preserve and destruction in bad faith.  *Bracey* is

23  quite clear in this regard, that simply establishing a duty to

24  preserve is not enough.  Bad faith is also required.  And bad

25  faith is defined as destruction for the purpose of hiding

1  adverse information.

2        The plaintiff has failed to meet this burden of

3  proof that Seventh Circuit law requires it to meet on its

4  destruction of evidence motion, and the burden does not shift

5  to the defendant.  Based on controlling law in this circuit

6  and Plaintiff's failure to submit sufficient factual evidence,

7  Defendant requests that the Court enter an order denying the

8  plaintiff's motion.

9        THE COURT:  All right.

10       MR. QUEARRY:  Thank you.

11       THE COURT:  Thank you very much.

12       MR. COOPER:  Your Honor, may I rebut that very

13  quickly?

14       THE COURT:  You may.

15       MR. COOPER:  Thank you, Your Honor.  Your Honor, the

16  Seventh Circuit case of *Marrocco v. GM Corporation* says that

17  sanctions can be imposed in any one of three -- in any one of

18  three instances, and this is a direct quote from the case,

19  Your Honor.  "Where the noncomplying party acted either with

20  willfulness, bad faith or fault...These...measures of

21  culpability are each wholly distinct from one another.  'Bad

22  faith,' for instance, is characterized by conduct which is

23  either intentional or in reckless disregard of a party's

24  obligations to comply...'Fault,' by contrast, doesn't speak to

25  the defendant's...disposition...but" instead speaks to, "the

1    reasonableness of the conduct -- or lack thereof."

2           In fact, the Northern District of Illinois, in

3    expounding upon the definition of fault, has said that fault

4    is appropriate -- I'm sorry.  "Fault can be found in three

5    circumstances:  Where the defendant exercised either

6    extraordinarily poor judgment, gross negligence, or reckless

7    disregard of a party's obligation.  All three forms of fault

8    can justify an award of sanctions."  That's from the case of

9    Porsche v. -- I'm sorry, Porsche v. Odom.

10          In this case, Your Honor, we respectfully request

11   that -- I'm sorry, that the -- we respectfully suggest that

12   the defendant's actions in this case were objectively

13   unreasonable after having received the notice from Comcast and

14   thereafter destroying the hard drive.

15          Your Honor, I'm further not aware of any court in

16   which -- I'm sorry.  I'm further not aware of any other court

17   order in which the court has refused to sanction a defendant

18   for destroying evidence that's relevant and actually lies at

19   the heart of the matter, such as the case here.  Thank you.

20          THE COURT:  Thank you.  Anything further,

21   Mr. Quearry?

22          MR. QUEARRY:  I don't believe at this time.

23          THE COURT:  All right.  Very good.  Well, excellent

24   work, everyone.  Thank you very much.  We are adjourned.

25          MR. LIPSCOMB:  Thank you, Your Honor.

1          MR. COOPER:  Thank you, Your Honor.

2          THE COURTROOM DEPUTY:  All rise.

3          (Off the record.)

4          THE COURT:  Can you restate that, Mr. Quearry?

5          MR. QUEARRY:  We would just seek leave to file

6  Mr. Bosaw's second supplemental expert report in connection

7  with the Comcast deposition transcript.

8          THE COURT:  Objection?

9          MR. LIPSCOMB:  Mr. Quearry, that report says that he

10 didn't find sammywalton44 as an e-mail address on the

11 computer.  Is that the basis of that?

12         MR. QUEARRY:  Correct.

13         MR. LIPSCOMB:  We'll stipulate to that.  The

14 whole -- that report just says that he didn't find

15 sammywalton44 as an e-mail address on that hard drive or the

16 Acer.  That being the case -- and I think what he's doing is

17 he's denying that that was the right e-mail address.  He named

18 his computer Sammy.  We don't know why Comcast would ever have

19 "sammywalton44" as his e-mail address unless he gave it to

20 them, but we'll stipulate that it wasn't -- that e-mail

21 address was not found on the Acer or the hard drive that he

22 gave us.

23         We won't stipulate to the fact that he must have

24 given it to Comcast.  Otherwise, why would they have recorded

25 it?  Or that it doesn't correlate to why he named his computer

1   "Sammy".  But, if he wants to make the position that he didn't

2   give him that e-mail address, that's an argument you can take.

3   THE COURT:  But he testified that he didn't give

4   them that e-mail address.

5   MR. LIPSCOMB:  Yes.

6   THE COURT:  Is that acceptable, Mr. Quearry.

7   MR. QUEARRY:  Yes, Your Honor.

8   THE COURT:  All right.

9   MR. QUEARRY:  Well, the other aspect of it is the In

10  Time is included in that report.  We stipulate that that was a

11  .link file --

12  MR. LIPSCOMB:  A dot what?

13  MR. QUEARRY:  A .link file and not a movie file.

14  MR. LIPSCOMB:  Is that true?  I don't think it

15  matters at all, so sure.  I don't think it's relevant at all.

16  THE COURT:  All right.  The parties stipulate it was

17  a .link file for the movie In Time.

18  MR. LIPSCOMB:  That's one of the Malibu movies,

19  right?  That's -- yeah, that's fine.

20  MR. QUEARRY:  No, it's not a Malibu Media movie.  I

21  don't think we would be here if it was.

22  MR. LIPSCOMB:  Yeah.  I don't think it matters.

23  THE COURT:  Very good.  And that satisfies your

24  request, Mr. Quearry?

25  MR. QUEARRY:  Yes.  Thank you, Your Honor.

106

1          THE COURT:  All right.  Anything further?

2          MR. QUEARRY:  No, Your Honor.

3          THE COURT:  Anything further?

4          MR. COOPER:  No, Your Honor.  Thank you.

5          THE COURT:  Thank you all again very much, and we

6    are now adjourned.

7          THE COURTROOM DEPUTY:  All rise.

8          (Proceedings adjourned at 10:58 a.m.)

9

10                  CERTIFICATE OF COURT REPORTER

11

12     I, David W. Moxley, hereby certify that the

13    foregoing is a true and correct transcript from

14    reported proceedings in the above-entitled matter.

15

16

17

18    /S/ David W. Moxley                December 22, 2014
      DAVID W. MOXLEY, RMR/CRR/CMRS
19    Official Court Reporter
      Southern District of Indiana
20    Indianapolis Division

21

22

23

24

25