1  IN THE UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF INDIANA
2
3  MALIBU MEDIA, LLC,                    )
                                         )
4        Plaintiff,                      )
                                         )
5          -vs-                          )CIVIL CASE NO.
                                         )1:12-cv-01117-WTL-MJD
6  R. STEPHEN HINDS, TROY LAMB,          )
   MICHAEL HARRIS, ROBERT JOHNSON,       )
7  MICHAEL HARRISON, JAMES DUNCAN,       )
   HOWARD McDONALD, and JOHN DOE         )
8  10,                                   )
                                         )
9        Defendants.                     )
10
11
12            DEPOSITION OF MICHAEL HARRISON
13
14      The deposition upon oral examination of
   MICHAEL HARRISON, a witness produced and sworn
15 before me, Diane Zeyen, RPR, a Notary Public in and
   for the County of Hamilton, State of Indiana, taken
16 on behalf of the Plaintiff, at the offices of
   Quearry Law, 386 Meridian Parke Lane, Suite A,
17 Greenwood, Johnson County, Indiana, on the 7th day
   of August, 2014, at 9:20 a.m., pursuant to the
18 Federal Rules of Civil Procedure with written notice
   as to time and place thereof.
19
20
21
22
23
24                    Exhibit "A"
25

1      address, who did you live with?
2 A I lived by myself for part of the time and she
3      had lived with me for part of the time.
4 Q Well, what part of the time did your girlfriend
5      live with you?
6 A For the last six months, I would say.
7 Q Did anybody live in the apartment with you
8      besides your girlfriend at any point in time?
9 A No.
10 Q You never had any roommates?
11 A No.
12 Q Who would have had access to your Internet
13      network during the time period of July 30th,
14      2012, through September 30th of 2012?
15 A I could say probably just myself, as far as I
16      know.  I think I mentioned before that
17      John Harlan may have connected a device, most
18      likely a cell phone to my Internet.
19 Q And how would that have been?
20 A I am sorry, could you repeat that?
21 Q How did it come about that John Harlan may have
22      connected his phone to your Internet?
23 A He would have used my wireless to connect his
24      phone, I am not sure, probably to watch Netflix
25      on it.

1 Q Is John Harlan a friend of yours?
2 A Yes.
3 Q So you are saying when he was over visiting he
4   may have connected his phone to it?
5 A Yes.
6 Q Did he ever use a BitTorrent client?
7 A No. He wouldn't have had a device that would
8   have been capable of downloading Torrents.
9 Q When's the last time you talked to John Harlan?
10 A Yesterday.
11 Q And why did you talk to him yesterday?
12 A I was asking him if he wanted to come over and
13   hang out this weekend.
14 Q Can I get the phone number for John Harlan?
15 A Yeah. The number I have for John Harlan is
16   765-247-9592.
17 Q Is that the number that you talked to him
18   yesterday with?
19 A Yes.
20 Q And do you know where he lives?
21 A He lives in Plainfield, Indiana. I am not sure
22   exactly where, though.
23 Q Has he moved?
24 A Yeah. He at some point lived in Indianapolis,
25   right off 31.

1         THE WITNESS: Is that right?

2         MR. QUEARRY: Sounds right.

3 Q When John Harlan connected his phone to your

4    Internet, did you provide him with the password?

5 A Yes, I did.

6 Q And what was the password that you provided him

7    with?

8         MR. QUEARRY: I mean, if it is something

9    that you use for other things, I would not give

10    it.

11 A I am not sure when he connected. I changed the

12    password.

13 Q When did you change the password?

14 A Right after I received the notice from Comcast.

15 Q Prior to receiving the notice from Comcast, did

16    you have a password on your Internet?

17 A Yes. The password was the default password on

18    the router.

19 Q And what was the default password on the router?

20 A I am not exactly sure. It is a series of

21    numbers and something about the model number.

22 Q Did you have a router plugged into your Comcast

23    hardware?

24 A The hardware I had I bought myself. I had modem

25    that I bought myself.

Veritext Florida Reporting Co.
800-726-7007         305-376-8800

1 Q And I believe you indicated that you don't have
2   Internet access right now?
3 A I do not.
4 Q Does Margie -- does Maggie have Internet access?
5 A No, she doesn't.
6 Q So there is no Internet at all at your current
7   location?
8 A No.
9 Q Why not?
10 A I just haven't connected it.  I haven't had the
11   money for it.
12 Q When you lived at Ventura Court, how far away
13   would you say your neighbors were?
14 A It was an apartment building, so just on the
15   other side of the wall.
16 Q Did you have neighbors on top, bottom, and all
17   the sides?
18 A Just on two sides and on top of me.
19 Q And what kind of an apartment was that?  Was it
20   a -- what was it made out of?  Was it a brick
21   apartment?  Was it wood, do you know?
22 A I do believe it was brick.
23 Q Were there other people in that apartment when
24   you went to look at your Internet signal, your
25   SSID, could you see other SSIDs when you looked?

1 A Yes; about 20.
2 Q And were they all secured?
3 A Not all of them. There were a few that weren't.
4 Q Did you ever use any of the SSIDs that were not
5    secured?
6 A No. I never had a reason to.
7 Q Because you had your own; right?
8 A Yes.
9 Q How long had you had service with Comcast cable?
10 A In total, about three years. I had also had
11    Comcast at a previous residence that I
12    transferred to the Ventura Court address.
13 Q What was the previous residence address, do you
14    know?
15 A I don't have any idea. I was just staying
16    there.
17 Q But that would have been prior to 2012,
18    obviously; right?
19 A Yes.
20 Q How much was your Comcast service per month?
21 A I am actually not sure. The last time I looked
22    I think it was about $80 a month.
23 Q And you haven't had Comcast since when, the end
24    of April or did it carry over into May?
25 A I think I cancelled the service in the beginning

1     capital H.
2 Q  So capital H-A-R-R-I-S-O-N?
3 A  Yes.
4 Q  Nothing else, no other characters attached to
5     that?
6 A  I don't believe so.  It has been awhile since I
7     have had to type the password in.
8 Q  Because it is stored in your system?
9 A  Yes.
10 Q  The password then has been changed twice; is
11     that correct?
12 A  I'm sorry?
13 Q  You changed the password twice then?  Initially
14     the password was the default password and then
15     you changed it to your last name?
16 A  I didn't have to change it the first time.  I
17     just changed it myself one time.
18 Q  Is the wireless Internet signal or was the
19     wireless Internet signal encrypted?
20 A  Yeah.
21 Q  What kind of encryption was it?
22 A  If I am not mistaken, it is WP2K or something.
23     I can't remember.
24 Q  Is it your position that somebody used your
25     Internet for the copyright infringement?

1   A   I am not sure.
2   Q   Does Maggie have any Internet capable devices?
3   A   Now she has a smartphone, which is Internet
4        capable.
5   Q   So both of you basically just use your phones if
6        you want to gain access to the Internet?
7   A   My phone is not capable of the Internet and she
8        just recently got a smartphone.
9   Q   What operating systems do you use on your
10       computers?
11   A   Windows.
12   Q   Which version of Windows?
13   A   Generally Windows 7 I think is what's running on
14       my computers now.
15   Q   Have you ever changed the operating system on
16       either of the computers?
17   A   The gaming computer at some point was also
18       running XP.
19   Q   So you changed from XP to Windows 7 on the
20       gaming computer?
21   A   Yes.
22   Q   And where did you get the software?  Where did
23       you get the Windows 7 from?
24   A   The certificate of authenticity for the gaming
25       computer came off of another machine that was

1           You're trying to get the entire file;
2      right?
3  A   You're intending to get the entirety of one
4      file, yes.
5  Q   Who was it that received notification that we
6      had issued a subpoena to Comcast?  Was it you?
7  A   Yes.
8  Q   And do you recall what day that was?
9  A   I don't remember the day specifically.  It was
10     at some point in October.
11 Q   After you got the notification from Comcast,
12     what did you do?
13 A   I looked it up on-line to see what it was.
14 Q   Did you conduct any investigation to find out
15     who, if anyone else, did do the copyright
16     infringement?
17 A   No.
18 Q   Why not?
19 A   I didn't think of it.  I didn't know that it was
20     a real thing at the time.
21 Q   What did you think the notice from Comcast was?
22 A   I just thought that it was -- I honestly don't
23     know.
24          I just thought they were looking for
25     information for something, but I wasn't entirely

1 sure what all of it was.
2 When I looked into it, then I saw the
3 copyright trolling and didn't assume anything
4 more of it. They said that it may just go away
5 on its own.
6 Q And at some point in time you were living with
7 your girlfriend.
8 Did you ever ask your girlfriend if she had
9 downloaded any of the films that were the
10 subject of the lawsuit?
11 A The only time she ever would use a computer is
12 to get on Facebook or Netflix. And that would
13 have been after the infringement, alleged
14 infringement happened.
15 Q So the answer is, no, you never asked her?
16 A No.
17 Q You mean correct?
18 A Sorry, correct.
19 Q I just want to make sure that we are accurate
20 with the response to that.
21 You never did ask your girlfriend if she
22 downloaded the films; correct?
23 A I never asked her.
24 Q Have you ever deleted any movies from either of
25 your computers?

1  A   The laptop probably.  It has had movies on it
2      before that I deleted, as necessary.
3  Q   Why did you delete movies from the laptop?
4  A   I just didn't want them anymore.
5  Q   When did that deletion occur?
6  A   I don't know.  It had been quite awhile, because
7      I haven't had any movies on there in quite
8      awhile.
9  Q   Did you ever talk to any of your neighbors in
10     the apartment about whether or not they had
11     committed the copyright infringement?
12 A   No.  I didn't know my neighbors.
13 Q   So you didn't do any investigation as to other
14     people that occupied the apartment adjacent to
15     yours?
16 A   No.
17 Q   Why was that, that you just didn't know them?
18 A   I didn't know them.  And if I think about it, I
19     don't see that that would have really done any
20     good.
21 Q   Have you taken any other action whatsoever to
22     determine who the infringer might have been?
23 A   No.
24 Q   Why not?
25 A   I don't know where to begin.

1 Q Did you speak with any expert witness or
2   computer specialists after you learned of this
3   lawsuit?
4       MR. QUEARRY: Objection.
5       MR. NICOLETTI: What's the objection?
6       MR. QUEARRY: Some of this is you're
7   getting into privileged communications based on
8   attorney-client privilege with my client.
9       MR. NICOLETTI: I didn't ask him if he
10  talked to you.  I asked him if he talked to the
11  expert witness or computer specialist after he
12  learned of the lawsuit.
13 A  I did not.
14 Q  I think you indicated that you did seek advice
15    from some of the blogs that are on the Internet
16    as to how to defend a copyright infringement
17    lawsuit; is that right?
18 A  Yes.
19 Q  What sites did you look at?
20 A  The only one I can remember is dietrolldie.com.
21 Q  Have you discussed this lawsuit with members of
22    your household, your girlfriend or any of your
23    family?
24 A  Girlfriend, yes.
25 Q  Do you have family in the area?

1 conduct of any type that Malibu Media failed to
2 adhere to?
3     MR. QUEARRY: Objection. All these
4 questions call for basically legal conclusions.
5 Assuming facts not in evidence. Go ahead and
6 answer.
7     MR. NICOLETTI: You can have a continuing
8 objection as to that, Gabe.
9     MR. QUEARRY: That's fine.
10 A I am sorry, I have now forgot the question
11 again.
12 Q Are you aware of any rules of professional
13 conduct that Malibu Media failed to adhere to?
14 A I don't think I could tell you. I don't know.
15 Q Do you have any reason to believe that the data
16 scanning system used to detect infringement does
17 not work?
18 A I don't know -- I don't understand your
19 infringement detection system, so I couldn't
20 tell you.
21 Q Okay. Do you have any evidence beyond your
22 speculation to the contrary that the data
23 collection system that recorded the infringement
24 of your IP address is inaccurate?
25     MR. QUEARRY: Objection.

1 A Other than me being involved in the case, no.
2 Q Do you know what a PCAP is?
3 A I do believe that's the way that your server
4 stores log files.
5 Q It is tantamount to a video recording of a
6 computer transaction between two computers, is
7 that your understanding.
8 MR. QUEARRY: Objection.
9 A I don't really understand the video recording
10 part, so I don't know.
11 Q Do you understand that PCAPs are used as
12 evidence in a lot of different types of cases
13 involving computer transactions?
14 A I didn't really know that. I had never heard of
15 PCAPs before this.
16 Q So you didn't know that PCAPs are used by the
17 FBI in child pornography cases?
18 MR. QUEARRY: Objection.
19 A I didn't know.
20 Q With that background, do you have any evidence
21 beyond your speculation that PCAPs are not
22 reliable and accurate evidence of what
23 transpires during a computer transaction?
24 MR. QUEARRY: Paul, I am going to refer you
25 to Harrison's expert witness's report with

1     regard to these questions.
2         MR. NICOLETTI: Yeah, I am asking him. I'm
3     not asking his witness.
4 A  Once again, can you repeat the question?
5 Q  Do you have any evidence beyond your speculation
6     that PCAPs are not reliable and accurate
7     evidence of what transpired during a computer
8     transaction?
9 A  I don't know enough about PCAP files to tell
10    you.
11 Q  Do you have any evidence beyond speculation that
12    suggests that anyone outside of your home used
13    your IP address?
14 A  I don't know.
15 Q  Do you have any evidence beyond speculation that
16    suggests that your Internet was hacked?
17 A  Anything I would say would be speculation of
18    that answer.
19 Q  Okay. How about, did anyone use your WiFi
20    without your permission?
21 A  If they did, I don't know about it.
22 Q  Okay. Did you commit the infringements alleged
23    in the complaint?
24 A  No.
25 Q  Do you know who did?